**UNITED STATES of America and Jack E. Smith**

v.

**Bruce A. LIPSHY.**

**No. CA 3–78–1002–F.**

United States District Court, N. D. Texas, Dallas Division.

Sept. 25, 1979.

---

Kenneth J. Mighell, U. S. Atty., Dallas, Tex., for plaintiff.

Ralph Muoio, Richard E. Timbie and Bernard Bailor of Caplin & Drysdale, Washington, D. C., Ethan B. Stroud, Dan McElroy and Cameron D. Sewell of Stroud & Smith, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

ROBERT W. PORTER, District Judge.

This is an action to enforce an IRS summons. The summons was issued on February 27, 1978 by an IRS Special Agent and was directed to Bruce A. Lipshy as Senior Vice President for Zale Corporation. It sought information relating to an interim report originally submitted to Zale's Board of Directors by an ad hoc investigatory committee. The report had issued pursuant to an investigation by the committee into alleged misconduct by Zale Corporation and certain of its officers. Although Mr. Lipshy had voluntarily furnished the IRS with a copy of the report, he declined to submit to its later request for underlying evidence. The IRS thereafter persisted by administrative summons pursuant to section 7602 of title 26 of the United States Code. After Mr. Lipshy failed to comply with the summons, the IRS sought judicial enforcement in this Court. In his answer, Mr. Lipshy asserts various grounds for dismissal of and as affirmative defenses to the petition. For the reasons stated in this opinion, I deny enforcement of the summons.

## I. GOVERNMENT WAIVER

■ The IRS waived its right to proceed in this Court to force Mr. Lipshy's compliance with the summons. The summons requested that he appear before IRS Special Agent Jack Smith on March 10, 1978. On March 3, 1978, Richard E. Timbie, an attorney for Mr. Lipshy and for Zale Corporation, contacted Special Agent Smith to advise him that Mr. Lipshy, upon Mr. Timbie's instruction, would neither testify nor produce the documents at the time specified in the summons. Mr. Timbie explained that he had directed this course, whereupon Special Agent Smith and Mr. Timbie agreed that Mr. Lipshy would not be required to be present at the time and place indicated in the summons. They further agreed that Mr. Timbie would assert the various objections to the summons in a letter to be directed to Special Agent Smith.

Mr. Timbie did write Special Agent Smith on March 9, 1978, restating the bases of Zale's objection in the summons. Mr. Lipshy now contends that the above agreement by Special Agent Smith waived any rights of the IRS to compel Mr. Lipshy's testimony or production of records as requested in the summons.

Mr. Lipshy relies upon *United States v. Malnik,* 489 F.2d 682 (5th Cir.), *cert. denied,* 419 U.S. 826, 95 S.Ct. 44, 42 L.Ed.2d 50 (1974), as authority for dismissal of the petition due to waiver by the government. In *Malnik,* counsel for the taxpayer had conferred with the IRS Assistant Regional Counsel, whereupon both agreed that Malnik would not appear personally at all. The IRS agreed to accept, instead of appearance and production, a written statement signed by Malnik and his attorney to the effect that, had Malnik personally appeared, he would have asserted "appropriate constitutional privileges." *Id.* at 684. The appellate court for this circuit affirmed dismissal of the petition solely on the ground that the IRS' agreement that Malnik need not comply with the demand of the summons effectively waived its right to subsequent judicial enforcement of the summons.[1]

The IRS distinguishes *Malnik* as presenting facts significantly more limited than those in this case. In *Malnik,* the taxpayer announced that he would assert a blanket objection under the fifth amendment to any questions. The court found improper the "indiscriminate" agreement between the IRS agent and Malnik that he need not appear as directed in the summons; rather Malnik should have been required to attend and raise his constitutional claim as to specific questions because it was impossible to anticipate every question and conclude that each would present an issue of self-incrimination. Because he was not required to appear under the summons, enforcement was denied. *Id.* at 688.

The IRS characterizes the conversation between Mr. Timbie and Special Agent Smith as being merely an agreement not to require Mr. Timbie to make a lengthy trip to Dallas solely to announce his client's grounds for opposing production of the records.

■ The IRS ignores the proper procedure for raising defenses when summoned under the provisions of section 7602. The

party should appear before the hearing examiner and refuse to testify about such matters as he believes to be privileged. *Reisman v. Caplin,* 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964). Although the defense raised in *Malnik* differed from those presented here, the underlying considerations remain valid. In *Malnik,* the presence of the taxpayer was necessary to crystallize requests and objections of the parties. A similar circumstance is present regarding the issue of attorney-client privilege here. Counsel should present himself and the records requested before the hearing examiner and specifically assert the claim of privilege as each question is asked. *United States v. Finley,* 434 F.2d 596 (5th Cir. 1970); *United States v. Roundtree,* 420 F.2d 845 (5th Cir. 1969). *See generally,* 15 *A.L.R.Fed.* 771 § 2(b) (Supp.1978). As to the work product claim, it is arguable that no similar circumstance appears to demand presence under the summons relating to defense of work product. Mr. Lipshy was required to bring certain records, the scope of which was clearly denoted in the summons itself. Consequently, his objection to their production on the ground of work product rule was one that could be made in advance of appearance. Special Agent Smith testified regarding the fact and substance of his March 3 conversation with Timbie. Smith confirmed that the Zale attorney had contacted him to inform him that Mr. Lipshy would not appear, whereupon the two discussed judicial enforcement of the summons. Special Agent Smith related his statement concluding the conversation: "We will seek enforcement."

It is inviting to distinguish the *Malnik* case from this on the basis that the former lacked true adversarial character on the part of the IRS where the facts displayed an agreement not to enforce the summons at the time and place indicated, coupled with an inconsistent stand taken some seven months after when the IRS demanded judicial enforcement of the summons. Al-

---

1. The court noted, however, that the IRS could issue a separate subpoena relating to the same subject matter, whereupon enforcement would

not be barred by application of any res judicata principle. *Malnik, supra,* 489 F.2d at 688.

though the facts before me do not suggest any subjective abandonment on the part of the IRS to demand compliance with the subject matter of the summons, it nonetheless demonstrates that the IRS agreed to dispense with an essential step in the examination and inspection process. In essence, the IRS would have the court condone a procedure whereby a summons was issued for a time and place certain, but by agreement the parties dispensed with the meeting. The IRS agent's belief that judicial compliance would be attempted does not cure the absence of administrative steps contemplated within the statutory framework. Moreover, by the nature of the attorney-client defense, it is imperative that a hearing be at least offered, so that the scope of enforcement is properly before the district court. In the absence of this, the Court will not in most cases have sufficient information upon which to make proper orders.[2]

## II. PRIVILEGE

Even had waiver not occurred, an alternate ground is present to bar enforcement of this summons. Rule 26(b)(1) of the Federal Rules of Civil Procedure limits discovery to matter that is not privileged. Mr. Lipshy objects to the substance of the summoned information on the ground that its disclosure would violate the attorney-client privilege and work product doctrine. To consider these issues, it is necessary to examine the function of Mr. Lipshy in Zale Corporation and his activities there during the relevant periods.

At the time of the summons' issuance, Mr. Lipshy served Zale Corporation in dual capacities. As an executive, he acted as Senior Vice President; in addition, Mr. Lipshy served Zale as Acting General Counsel, a duty he had assumed in November 1975 when Zale's previous house counsel had resigned. Mr. Lipshy continued as Zale's general counsel for approximately thirteen months, in which capacity he undertook responsibility for all legal affairs of the company.

In early 1976 Shearn Rovinsky terminated his employment as Zale's treasurer, and he later made various charges of misconduct against Zale Corporation and its officers and employees. One of the allegations involved political contributions that may have been made in earlier years. Zale's chairman requested Mr. Lipshy to investigate the charges. On April 23, 1976, a Special Ad Hoc Committee was formed to complete the investigation, and Mr. Lipshy served as counsel to that committee.

On August 11, 1976, the Committee adopted a report of findings and conclusions and submitted the report to its Board of Directors. One of the findings made disclosed disbursement of some $25,000 from a Zale diamond trading account in Antwerp, Belgium, which sums were not accounted for. The report further found that approximately $20,000 of these funds were used to reimburse officers of Zale Corporation for political contributions made on Zale's behalf. The report was based on the investigation made by Mr. Lipshy, in which he had interviewed employees, officials and directors of Zale Corporation. Mr. Lipshy contends that the communications and data collected during the course of this investigation are protected from disclosure through the summons.

### A. Attorney Client Privilege.

▮ The summons before me required Mr. Lipshy to appear before the hearing examiner to give testimony relating to the tax liability of Zale Corporation. Mr. Lipshy's refusal to comply was based on his assertion that his testimony would violate the attorney-client privilege. A section 7602 summons may be challenged appropriately by asserting an attorney-client privilege. *Reisman v. Caplin*, 375 U.S. 440, 449, 84 S.Ct. 508, 513, 11 L.Ed.2d 459 (1964); *United States v. McKay*, 372 F.2d 174 (5th

---

**2.** Section 7604 confers upon the judge "power to make such order as he shall deem proper . . . to enforce obedience to the require- ments of the summons and to punish such person for his default or disobedience."

Cir. 1967).[3] The privilege applies to confidential communications between an attorney and his client in which the latter seeks legal advice. Recognition of the privilege strengthens an attorney's assurance to his client that any conversation spoken in confidence will not be later disclosed and fosters the free communication necessary for the attorney to render effective legal assistance. *See United States v. Long*, 328 F.Supp. 233 (E.D.Mo.1971).

█ This circuit has adopted the standard enunciated by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950), to guide in determining whether the attorney-client privilege may be respected:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*United States v. Kelly*, 569 F.2d 928 (5th Cir. 1978), quoting *United Shoe Machinery, supra*, 89 F.Supp. at 358.

█ To establish the propriety of cloaking the summoned information with the privilege, it is therefore necessary to examine the facts and circumstances present to determine whether all elements necessary are present. In this regard I note that Zale Corporation, which claims the privilege, bears the burden of establishing the requisite determinants. *United States v. Kelly, supra*, 569 F.2d at 938; *United States v. Johnson*, 465 F.2d 793 (5th Cir. 1972). *See also Heathman v. United States District Court*, 503 F.2d 1032, 1033 (9th Cir. 1974). Should Zale Corporation satisfy its showing, Mr. Lipshy may not be compelled to testify regarding information he knew or regarding his advice or opinions held by virtue of the attorney-client relationship.

█ 1. *Whether Mr. Lipshy acted as attorney for Zale Corporation when he communicated with witnesses, employees, agents and officers during the investigation.* Prior to and during the existence of the Special Ad Hoc Committee, Mr. Lipshy, an attorney licensed in this state, possessed titles and duties of Director, Senior Vice President and Acting General Counsel. Mr. Lipshy testified that he was directed by the Chairman of the Board of the Executive Committee of Zale's Board of Directors to serve as counsel to the Special Ad Hoc Committee. Under the Committee's directive, Mr. Lipshy conducted interviews of company officers and employees. He testified that these interviews were conducted solely in his role as counsel to the Committee.[4] House counsel is considered to be an attorney for purposes of the privilege where he was performing services of a legal nature when he made or received the communication. *See Garner v. Wolfinbarger*, 430 F.2d 1093, 1102 n.18 (5th Cir. 1970).

The distinction between investigative conduct evidenced by Mr. Lipshy as management executive and as corporate attorney is not a bright one. In this regard, Mr. Lipshy helpfully notes that his investigation was conducted with the purpose of obtaining information needed to advise the Committee in the legal implication of charges of misconduct. Although such testimony might be criticized as self-serving, I find as

---

3. This circuit has ruled that the question of the attorney-client privilege, as applied in the sphere of federal income tax investigation, is a question of federal law. *United States v. Finley*, 434 F.2d 596 (5th Cir. 1970).

4. The report as issued, however, was signed by Bruce A. Lipshy as Senior Vice President of Zale Corporation. Mr. Lipshy's explanation that the omission of his title as Acting General Counsel was because they "are just not that formal" is somewhat ingenuous. I have not found the descriptive title to be determinative of his function, however.

a fact that Mr. Lipshy did so act, and indeed, I find no reason to doubt his good faith in making these statements, for he acted in the capacity of General Counsel well before creation of the Special Ad Hoc Committee.[5]

■ 2. *Whether the communications were made to Mr. Lipshy by his client, Zale Corporation.* The attorney-client privilege is available to corporations. *Garner v. Wolfinbarger, supra,* 430 F.2d at 1097 n.10; *Radiant Burners, Inc. v. American Gas Ass'n.,* 320 F.2d 314 (7th Cir. 1973). Because the corporation can communicate only through its human agents, the obvious question arises: which individuals may "be" the corporation for purposes of the attorney-client privilege?

■ The issue is significant because the privilege extends only to communications between the attorney and his client and does not reach information secured by the attorney from a witness or from a third party. *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Not surprisingly, courts have differed in their determinations of who may bear the relationship of client to the attorney sufficient to constitute a communication between the corporation and attorney.

■ The parties have cited no case in this circuit, nor have I found one, that provides a standard to guide courts in making this determination. The tenth circuit has formulated a "control group" test to aid in assessing eligibility of individuals to represent the corporation for purposes of invoking this privilege. *Natta v. Hogan,* 392 F.2d 686 (10th Cir. 1968).

If the employee making the communication, of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney, or if he is an authorized member of a body or group which has the authority, then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply. In all other cases the employee would be merely giving information to the lawyer to enable the latter to advise those in the corporation having the authority to act or refrain from acting on the advice.

*City of Philadelphia v. Westinghouse Electric Co.,* 210 F.Supp. 483 (E.D.Pa.1962).

A more liberal test has been accepted in other jurisdictions.[6] Mr. Lipshy relies on a test formulated in the eighth circuit that uses a "subject matter" approach.[7] Al-

---

**5.** Obviously, the fact that the summons was issued to Mr. Lipshy in his capacity as Zale Vice President and at a time when he no longer served as Acting General Counsel to the corporation in no way minimizes the nature and quality of his efforts during his investigation and is of no significance in determining whether elements of the privilege were present. In addition, Zale has been steadfast in its claim of privilege, despite any change in the status of this employee.

**6.** *See, e. g., Harper & Row Publishers, Inc. v. Decker,* 423 F.2d 487 (7th Cir. 1970), *aff'd per curiam,* 400 U.S. 348, 91 S.Ct. 479, 27 L.Ed.2d 433 (1971), finding that an employee at a corporation, though not a member of its control group, is sufficiently identified with the corporation so that his communication to the corporation's attorney is privileged where the employee makes the communication at the direction of his superiors in the corporation and where the subject matter upon which the attorney's advice is sought by the corporation and dealt within the communication is performance

by the employees of the duties of his employment.

This standard appears to embrace even interviews made by employee-witnesses, and thus it conflicts with the well-settled proposition that the privilege does not extend to information secured by an attorney from a witness while acting on behalf of his client in anticipation of litigation. *Hickman v. Taylor,* 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947). Not surprisingly, the test recited in *Harper* has received criticism because of its broad scope, and I reject it.

**7.** *Diversified Indus., Inc. v. Meredith,* 572 F.2d 596 (8th Cir. 1977, en banc decision 1978). That opinion respects an attorney-client claim of privilege if (1) the communication was made for the purpose of securing legal advice; (2) the employee making the communication did so at the direction of his corporate superior; (3) the superior made the request so that the corporation could secure legal advice; (4) the subject matter of the communication was within the

though he characterizes this method as representing the modern test, two recent cases have approved the "control group" standard. The third circuit, in *In Re Grand Jury Investigation*, 599 F.2d 1224 (3d Cir., 1979) recognized that a clear majority of federal courts adhere to the control group test. While commenting that the issue was a difficult one, the court considered the policy underlying the privilege is not furthered by its extension to employees other than those of the control group. This analysis furthers the pronouncement of this circuit in *Garner v. Wolfinbarger, supra*, in which the court of appeals for the fifth circuit stated that the attorney-client privilege must be recognized only against the background of the general principle of the duty to disclose. "It ought to be strictly confined within the narrowest possible limits, consistent with the logic of its principle." *Id.* at 1101, citing 8 *Wigmore, Evidence* § 2291 at 554.

A similar rationale was utilized by the sixth circuit in its recent decision of *United States v. Upjohn Co.*, 600 F.2d 1223, 1225–26 (6th Cir., 1979). The court approved the control group test as sufficient to encourage a corporation's decision-makers to make full and free confidential disclosure to counsel. At the same time, the control group test, as the more limited standard, recognizes that the subject matter approach extends the privilege too far, to seal from discovery even communications unknown to corporate management. The decisions recognizing the control group test represent a sound and thoughtful analysis of the privilege, and I believe it to be the proper standard.

Mr. Lipshy interviewed witnesses, directors, officials and employees of Zale. The interviews he recalled were those he conducted with M. B. Zale, Chairman Emeritus and founder of Zale; Ben Lipshy, Director, Chairman of the Board, and Member of the Executive Committee; Donald Zale, President, Director, and Member of the Executive Committee; Lou Zale, former Vice-President and Director; Marvin Zale, Group Vice-President and Director. Of those named, it appears that all satisfy the control group test as being members of that body. Each serves in a position of control within the meaning of the standard.

■ 3. *Whether the communications made were confidential.* An essential requirement of the attorney-client privilege is that the client must communicate in confidence with the attorney under circumstances where it is reasonable to assume that he does not intend that the communications should be relayed to third parties, *United States Shoe Machine, supra*, and moreover, they must be maintained in confidence. *United States v. Pipkins*, 528 F.2d 559 (5th Cir. 1976). The evidence adduced demonstrates that the communications made to Mr. Lipshy were clearly confidential in nature.

■ Communications otherwise entitled to the attorney-client privilege may be waived. *In Re Grand Jury Proceedings*, 73 F.R.D. 647, 652 (N.D.Fla.1977). The client may waive the privilege, either expressly or implicitly by conduct that extinguishes one of the elements of the privilege. *Id.*, citing *Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974). Zale has not expressly waived the privilege.

■ The circuit has adopted a dual test to determine whether the attorney-client privilege otherwise applicable, has been impliedly waived:

A leading text in the field of evidence [8 Wigmore, Evidence Section 2327 at page 638] arrives at the same conclusion. It notes that waiver by implication involves two basic elements. The first is subjective—Does the person holding the right to claim the privilege intend to waive it? The second element is objective—Is it fair and consistent with the assertion of the claim or defense being made to allow the privilege to be invoked? This objec-

---

scope of the employee's corporate duties; and (5) the communication was not disseminated beyond those persons, who, because of the corporate structure, needed to know its contents.

tive determination should be based upon whether the position taken by the party goes so far into the matter covered by the privilege that fairness requires the privilege shall [terminate] when, subjectively, he never intended the result. *United States v. Woodall*, 438 F.2d 1317, 1324 (5th Cir. 1970).

In applying this test to the two instances of claimed waiver, it is apparent that Zale Corporation did not intend to waive its attorney-client privilege.

■ The IRS claims that waiver took place on two separate occasions of conduct by Zale: by disclosing the report to the Internal Revenue Service, and by disclosure on SEC form 10k. The substance of the disclosure was that cash had been withdrawn from the Zale Corporation's unofficial agency account balance in Antwerp, Belgium and brought to the United States for the purpose of reimbursing senior corporate officers for past political contributions. Although the government's position would find the statements contained in these reports sufficient to justify its discovery of all details underlying the statement, regardless of privileged nature, I cannot accept this view, for I find it contrary to the second requirement of *Woodall*. The acts taken by Zale Corporation may not, in all fairness, justify disclosure of testimony otherwise protected by the attorney-client privilege.[8]

### B. *Work Product Doctrine.*

■ A qualified immunity from discovery under the Federal Rules is extended to the content of information prepared by an adverse party's counsel in the course of preparation for possible litigation. *Hickman, supra.* The doctrine is identified with the attorney-client privilege in the limited sense that "work product" represents efforts expended by the attorney during the course of the attorney-client relationship.

See generally 35 *A.L.R.*3d 412, 423 (Supp. 1978). It differs significantly, however, regarding what matter is protected and the degree of protection afforded.

The summons at issue directed Mr. Lipshy to produce documents and tangible things of a category described as:

all records, workpapers, and memoranda, prepared in connection with the submission by you, of evidence to the Special Ad Hoc Committee of the Board of Directors of Zale Corporation, created by Resolution adopted by the Executive Committee of the Board of Directors at a special meeting held on April 23, 1976, in connection with the committee's investigation into the 'Rovinsky charges of illegal political contributions', item III.B. of the First Interim Report of the Special Ad Hoc Committee bearing the date of August 11, 1976.

■ 1. *Whether the items requested are work product.* I have previously found that Mr. Lipshy acted as Zale's counsel while he investigated the Rovinsky charges for the Special Ad Hoc Committee. In addition, it appears that his efforts were motivated by the anticipation of some likely future litigation, a requirement under the doctrine. *J. H. Rutter Rex Mfg. Co. v. NLRB*, 473 F.2d 233, 234 (5th Cir. 1973). Mr. Lipshy's mission to investigate the Rovinsky charges of improper political payments concerned a serious issue, coming as they did from a former, highly-placed official in the corporation. The investigation occurred at a time when the IRS was itself conducting an extensive and wide-ranging investigation into Zale's tax liability. The circumstances surrounding and the import of the Rovinsky charges of improper political payment rendered the prospect of litigation sufficiently likely to satisfy this element. Moreover, Mr. Lipshy saw the added spectre of an SEC enforcement action regarding possible disclosure violations. Mr.

---

8. Even courts permitting a finding of waiver have done so only where convinced that the conduct justified disclosure of details balanced against unwillingness to jeopardize the salutory purposes of the privilege through unwarranted scope of waiver. *United States v. Cote*, 456 F.2d 142, 145 n. 4 (8th Cir. 1972). *See also United States v. Lake*, 257 F.Supp. 35, 37 (E.D. N.C.1966) (waiver does not thereby create a "free field for . . . access within which to roam at random").

Lipshy noted that the SEC had contacted Zale to see how the corporation was handling the allegations. A third potential source of litigation in possible shareholder suits provided an additional possibility for eventual litigation on this subject. *See Zenith Radio Corp. v. Radio Corp. of America,* 121 F.Supp. 792 (D.Del.1954).[9]

Merely securing documents or records in the role of attorney and in anticipation of possible litigation does not automatically shelter such materials from production under the work product rule. It is fundamental that the rule offers its limited protection only to those documents and things that the attorney or his agent prepared. If the items were not prepared by the attorney or his agent under the circumstances outlined above, their discovery is not barred by the work product rule.[10] Had Mr. Lipshy merely assembled documents that are otherwise relevant and material to the investigation of Zale Corporation relating to the Rovinsky charges, he could not shield their disclosure through label of work product. *McKay, supra,* 372 F.2d at 177.[11] The principle underlying the work produce doctrine affords protection to the adverse party's strategy for litigation.

In its legal memorandum, the IRS describes Revenue Agent Kelley's intention to seek the documents upon which the Ad Hoc Committee based its conclusion and recites that "he thereupon requested that Special Agent Jack E. Smith issue a summons for the documents forming the basis for the statements contained in paragraph IIIB of the interim report." Supplemental Brief in Support of Motion for Protective Order at 2. The wording of the summons itself, however, is considerably more restricted. It requests that Mr. Lipshy produce only documents and tangible things that were

*prepared in connection with his submission* of evidence to the committee. A summons more broadly worded would encompass evidence relevant to the IRS' inquiry but which did not necessarily present hazards attending disclosure of true work product items. This observation is more than mere semantic nitpicking. The test for work product has been described as "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation." *Osterneck v. E. T. Barwick Indus.,* 82 F.R.D. 81, 87 (N.D.Ga.1979), quoting 8 *Wright & Miller, Federal Practice & Procedure* § 2024 at 198 (1970). When Mr. Lipshy argues that all documents sought by the summons are work product, he does not discuss other tangible things that he collected during his investigation and that might produce evidence relevant to the IRS' own examination into the events surrounding the alleged payments. Such documents are not sought by the wording of the summons.

2. *Whether disclosure of work product items is warranted.* My finding that the documents sought by the summons are work product of Mr. Lipshy does not end my inquiry. The prohibition of the doctrine is not absolute: the rule announced in *Hickman* permits disclosure of work product items upon a showing by the party seeking discovery of his substantial need of the materials in the preparation of his case and inability without undue hardship to obtain the substantial equivalent of the materials by other means. *Hickman, supra,* 329 U.S. at 511–12, 67 S.Ct. at 393–94. Federal Rule 26(b)(3) codifies this requirement:

(3) *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery

---

9. In fact, shareholder suits and an SEC enforcement proceeding were brought against Zale Corporation relating to the Rovinsky charges during the year following Mr. Lipshy's investigation.

10. The doctrine does not apply to the existence or location of information, but only to the contents of that information.

11. In this regard, I note Mr. Lipshy's testimony that he reviewed records during this investigation. He remembered some were Belgium corporate records and others were personnel files.

of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insuror or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The IRS argues that the work product doctrine is not a defense recognized in this circuit to production of items for an IRS administrative summons. It bases its contention on language contained in *McKay v. United States*, 372 F.2d 174, 176 (5th Cir. 1967). That opinion voiced doubts of the appellate court as to the relevancy of the doctrine in such proceedings, reasoning that (1) the criteria of relevancy and materiality have broader connotations than in the context of trial evidence and (2) the inquisitorial powers are justified because the taxpayer has "all the facts." Despite the reservations expressed, the court did not announce, nor has it subsequently, an absolute bar to the doctrine in all summons enforcement cases. I do not believe that the opinion stands for the proposition argued by the IRS. Rather, I find that the language implicitly recognized the dual analysis required in work product situations: whether the documents sought are within the definitional meaning of attorney work product and if so, whether the party seeking discovery has demonstrated need and hardship as mandated by *Hickman* and the Federal Rules. The statements contained in the *McKay* opinion appear to relate to the second element of the doctrine, permitting discovery of work product materials upon a proper showing of need and unavailability by the discovering party.

▮ Other courts considering the work product doctrine have noted that the strength of the showing required depends on the particular facts and issues of the case. *See* cases collected at 35 *A.L.R.*3d 412, § 26 (Supp.1979). In this light, the *McKay* language hints that the IRS showing would usually be met because of the relevancy and typical placement of the documents in such cases. I conclude that the work product doctrine has a place in summons enforcement proceedings and that the court must carefully analyze the usual requirements under the rule to determine whether it shall be respected as to the documents and tangible things in issue.[12]

The position taken by the IRS is that even if the Court recognizes applicability of the work product doctrine in this summons proceeding, it has satisfied its burden of showing need. It has made no showing of need, however, but merely complained that requiring it to expend effort in seeking through alternative sources the facts earlier investigated by Mr. Lipshy would be duplicative, expensive and burdensome.

▮ Under *Hickman*, the party seeking disclosure of attorney work product items has the burden of establishing that the documents are essential to the preparation of its case, *Hickman*, 329 U.S. at 511, 67 S.Ct. at 393, and such necessity may arise where

---

**12.** The seventh circuit, while noting the *McKay* opinion, has concluded that the work product doctrine can apply to a summons enforcement proceeding. *United States v. Brown*, 478 F.2d 1038 (7th Cir. 1973). Its analysis included the observation that the strong public interest expressed by Congress in enforcement of the Internal Revenue Act may be relevant in considering the degree of necessity which need be shown prior to the enforcement of an order to produce. *Id.* at 1041. The lower court had found that the government had met its initial burden in expressing a good faith belief that the documents in issue were necessary for a correct determination and that the information contained in the document could not be obtained from any other source. My finding as to the IRS showing here is found infra in this section.

the information contained in the documents is unavailable through other means or can be reached only with difficulty. *Id.* It is not permitted merely to aid opposing counsel to help prepare himself and to make sure that he has overlooked nothing. *Id.* at 513, 67 S.Ct. at 394. Here, the IRS has made no showing, other than its conclusory allegation of burdensomeness, that the documents and things prepared by Mr. Lipshy are needed within the meaning of *Hickman* and Rule 26. At most the record before me suggests that the items sought would be helpful to the IRS in its investigation. They are clearly relevant to its inquiry, but I cannot find that the IRS could not gain the content of their subject matter through other means.

Mr. Lipshy has charged that the IRS already possesses certain records, in addition to the Committee Report, reflecting Zale's reimbursement of political contributions. The IRS has not refuted this and has made no showing of why it needs items prepared by Mr. Lipshy. Similarly, the IRS has not responded to the charge that it could get non-privileged information from sources other than Mr. Lipshy. The insufficiency of the IRS' showing compels my conclusion against enforcement, and this is so despite my full recognition of and agreement with the importance of disclosure in tax investigations. Nevertheless, the IRS limited its request to documents and tangible things prepared in connection with Mr. Lipshy's submission to the Committee. It has made no showing of unavailability, merely claiming burdensomeness. *See Republic Gear Co. v. Borg-Warner Corp.*, 381 F.2d 551 (2d Cir. 1967).

### III. PURPOSE OF SUMMONS ISSUANCE

My denial of enforcement rests solely on the foregoing grounds. Mr. Lipshy has challenged propriety of the IRS' purpose in issuing the summons. He contends that the summons was issued in bad faith or for an improper purpose. I reject this contention as a basis upon which to bar enforcement of the summons.

Applicable standards to evaluate such challenges are found in the recent case of *United States v. LaSalle National Bank*, 437 U.S. 298, 318, 98 S.Ct. 2357, 2368, 57 L.Ed.2d 221 (1978):

In summary, then, several requirements emerge for the enforcement of an IRS summons. First, the summons must be issued before the Service recommends to the Department of Justice that a criminal prosecution, which reasonably would relate to the subject matter of the summons, be undertaken. Second, the Service at all times must use the summons authority in good faith pursuit of the congressionally authorized purposes of § 7602. This second prerequisite requires the Service to meet the *Powell [United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112] standards of good faith. It also requires that the Service not abandon in an institutional sense, as explained in Parts III–A and III–C above, the pursuit of civil tax determination or collection.

It is undisputed that the IRS had made no recommendation to the Department of Justice for criminal prosecution of Zale at the time of the summons' issuance. The IRS contests the characterization regarding its summons and asserts instead that it was involved in investigation of both civil and criminal tax liability at that time.[13]

The *Powell* opinion, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964), requires the Commissioner to show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the information sought is not already within his possession, and that the administrative steps required by the Code have been followed. *Id.* at 57, 85 S.Ct. at 254.

---

**13.** In July 1978 the Criminal Enforcement Division referred thirty-one Zale subsidiaries and several individual cases to the Office of District Counsel with a recommendation for criminal prosecution.

The investigation of Zale Corporation has been long-lasting and extensive in its scope. The IRS began its investigation in February 1976 following a tip that the corporation and its subsidiaries may have underreported tax liability for a period of time. The examination has involved both civil and criminal aspects, and has extended to Zale Corporation and to more than one thousand of its subsidiary corporations, each of which files separate returns. The Special Ad Hoc Committee was formed to gather evidence relating to alleged improprieties, charges that were made by Shearn Rovinsky, Zale's former Treasurer. The committee was formed on April 23, 1976 and its first report was issued August 11, 1976. The copy of this report triggered a further request by the Service for the facts underlying the report's statement that cash had been withdrawn from Zale Corporation's unofficial agency account balance in Antwerp, Belgium, and brought to the United States for the purpose of reimbursing senior corporate officers for past political contributions. This statement appears to have been the first indication to the IRS that officers had made political contributions. To investigate the issue thus raised with a view toward determining tax liability that might therefore have accrued, Revenue Agent Kelley requested that Mr. Lipshy furnish the documents upon which the statement was based. The Revenue Agent requested that Special Agent Jack Smith issue a summons for this purpose. Agent Smith had previously acted as a coordinator to issue summonses in the tax investigation of the Zale case.

■ 1. *Harassment.* Mr. Lipshy has charged that the summons was not issued in good faith because it was issued in furtherance of an illicit scheme to assist a government informant in a campaign to intimidate and harass Zale Corporation, Bruce Lipshy and other Zale officers and agents. As support for this contention, Mr. Lipshy produced affidavits of Mr. Timbie and himself, both outlining their view of the history of investigation of the corporation. Mr. Lipshy was permitted prehearing discovery, on the authority of *United States v. Garrett,*

571 F.2d 1323 (5th Cir. 1978) and previous cases in this circuit, to depose the special agent and revenue agent involved in the issuance of this summons. I have reviewed each charge asserted and conclude that Mr. Lipshy has failed to demonstrate that this summons was issued as part of any scheme to harass him or Zale Corporation or others. I will not permit the allegations of agent misconduct to divert my role: this is a summons enforcement proceeding with the limited goal of determining whether enforcement should be granted as to this particular summons. Any suggestion of agent misconduct occurring during the course of this investigation has displayed no nexus with the issuance of this summons. Instead, the revenue agent working on the case testified convincingly that he was concerned with the civil computation required to complete his functions.

The motives and conduct of Mr. Rovinsky will not be imputed to the IRS as an institution addressing the issuance of the summons. Likewise, I cannot find evidence that the allegations of Rovinsky's misconduct were matched by the agents triggering the issuance of this summons. *LaSalle* indicated that agent motive could be necessary to evaluate the good-faith factors of *Powell,* including consideration of whether a summons was issued to harass a taxpayer. *LaSalle, supra,* 437 U.S. 298, 316 n. 17, 98 S.Ct. 2357, 2367 n. 17, 57 L.Ed.2d 221. The evidence before me, however, shows propriety of the motives of the agents involved in issuance of this summons. The charge of harassment must relate to the issuance of the summons for which enforcement is sought. *Powell, supra,* 379 U.S. at 58, 85 S.Ct. at 255. In this connection, I deny Mr. Lipshy's motion to require answers to questions relating to Rovinsky meetings. Mr. Lipshy can pursue the issue of agent misconduct elsewhere. Based on my finding that the summons was issued for a proper purpose and not for the purpose of harassment, however, any misconduct occurring during the course of this lengthy investigation does not offer an avenue of permissible pursuit in this particular proceeding. Simi-

larly, any failure of the Inspection Division to disclose results of investigation into alleged agent misconduct has not affected this summons' issuance.

2. *Sole Criminal Purpose.* Mr. Lipshy asserts a second ground of bad faith issuance of this summons by claiming that it was issued solely for the purpose of gathering evidence for a criminal prosecution of Zale Corporation. Prehearing discovery of Agents Smith and Kelley was permitted for the purpose of exploring this issue, as well as the issue of harassment.

A section 7602 summons is proper in aid of a tax investigation into both civil and criminal consequences. *LaSalle, supra; Couch v. United States,* 409 U.S. 322, 326, 93 S.Ct. 611, 614, 34 L.Ed.2d 548 (1973); *Donaldson v. United States,* 400 U.S. 517, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). Its good faith issuance, however, is properly challenged by allegations that it was issued for solely criminal purposes, *LaSalle, supra.* The *LaSalle* opinion clarified the challenge to impose on the resisting taxpayer the burden of showing that the IRS used its summons authority in good faith by not abandoning in an institutional sense the pursuit of civil tax determination or collection.

Revenue Agent Kelley worked on the Zale case beginning in 1976 and was later joined by six other revenue agents working at different times on the case. In September 1976 a special agent was assigned to the case. The procedure ultimately developed to secure production of records in this extensive investigation included issuance of administrative summonses. The requesting agent would submit his request to one individual, Special Agent Smith, who would then issue the summons. Special Agent Smith issued 30–40 summonses in this way. This procedure was one that Revenue Agent Kelley had utilized prior to his request for the documents at issue here.

Revenue Agent Kelley had seen the interim report, issued by the Special Ad Hoc Committee and subsequently determined that Audit had not considered any of the records that related to reimbursements from the Antwerp account. After determining that the Intelligence Division did not have any such records, Kelley requested the information to determine whether deductions for what the report had termed "illegal" contributions had been taken during the examination years.[14]

As of the date of the summons, Kelley had not completed his civil tax examination. Although he had concluded his investigation into certain areas, he claimed that other areas remained before any final tax determination could be made. Kelley believed that the information contained in the records requested in this summons was necessary to make such a final determination. His assessment of the audit status was echoed by Revenue Agent Markey, who served as the first level of management in the tax examination of Zale Corporation and its subsidiaries. Mr. Markey, as Mr. Kelley's supervisor, had discussed the political contributions and accounts. In his opinion, they raised a potential problem that could result in civil fraud penalties.

An administrative summons is to be measured as of the time of its issuance. *Garrett, supra,* 571 F.2d at 1327. A later recommendation will not of itself establish that at the time of issuance the IRS had abandoned its pursuit of civil tax determination. Moreover, the various layers of review and consideration attendant to calculation and collection of civil penalties render such an objection unconvincing:

> Only after the officials of at least two layers of review have concurred in the conclusion of the special agent does the

14. The report noted amounts of varying sums, with a total amount of cash that was not accounted for being approximately $25,000. Kelley noted his position as revenue agent on the case considered disallowing deductions after considering facts and circumstances surrounding the withdrawal and deposit of these funds. At the point of the summons' issuance, Kelley claimed that an adjustment was being considered. He was unsure whether the effect of the adjustment would have been to disallow withdrawal of Antwerp money because he didn't know what the Antwerp records reflected.

referral to the Department of Justice take place. At any of the various stages, the Service can abandon the criminal prosecution, can decide instead to assert a civil penalty, or can pursue both goals. *LaSalle, supra,* 437 U.S. at 315, 98 S.Ct. at 2366. Consequently, Mr. Lipshy's offer of the recommendation of July 25, 1978 from the Criminal Investigation Division to District Counsel that criminal prosecution occur does not evidence abandonment. Moreover, the summons involved here was instigated by the request of Revenue Agent Kelley, rather than at the instance of Special Agent Smith. Smith merely served as an administrative conduit for the issuance of summons. Indeed, Smith claimed that he had no interest in the summoned information at the time of issuance.[15]

The referral to District Counsel did not include the issue of political contributions from the Belgium accounts. As of this date, the District Counsel's office has made no determination whether criminal prosecution should be undertaken in this case. No recommendation or referral has been made to the Department of Justice.

The controlling date is the date the IRS recommends prosecution to the Justice Department and not the date the agent recommends prosecution to the IRS. *LaSalle, supra,* 437 U.S. at 313 n. 15, 98 S.Ct. at 2365 n. 15; *United States v. Schutterle,* 586 F.2d 1201, 1204 n. 5 (8th Cir. 1978). As noted earlier, legitimacy of an IRS summons is tested as of the date of issuance. *Garrett, supra,* 571 F.2d 1327.

Mr. Lipshy does not suggest that this is a case where Zale or its subsidiaries could have no civil liability as a consequence of the IRS' investigation into the area. *Cf.,*

*United States v. Hankins,* 565 F.2d 1344 (5th Cir. 1979). Rather he claims that the extreme length of the case, the numbers of people involved in its investigation, and the involvement of the IRS with Mr. Rovinsky cumulatively produce an institutional commitment solely for criminal investigation. It is undisputed that the IRS has utilized many agents to investigate Zale and its subsidiaries, and that their examination has continued over a long period of time. An examination of this scope would hardly occasion a brief and cursory investigation, however.

Nor has it been shown that this investigation has had such a "dominant criminal aura" to bar use of the administrative summons. I reject Mr. Lipshy's claim that a decision made by an agent in spring of 1977 to recommend prosecution of Zale bars use of the administrative summons. This does not show institutional abandonment of civil tax purpose. It is well established that both criminal and civil aspects of a case often properly coexist. Thus, any claim that a relatively prompt referral to the Intelligence Division conclusively evidences "prejudgment" and an institutional commitment must fail.[16]

The question of whether the investigation of Zale and its subsidiaries had solely criminal purpose must ultimately be answered by an examination of the institutional posture of the IRS as consistent with honest pursuit of the goals of section 7602 in issuing the summons. The factual circumstances attending the issuance here as found above demonstrate that the IRS had not abandoned its quest for a determination of Zale's civil tax liability. Moreover, it was

---

15. Even information gained by a special agent solely to discover criminal violations may be used by the IRS to establish civil tax liability, because the information required for each is substantially the same. *United States v. Schutterle,* 586 F.2d 1201, 1203 n. 4 (8th Cir. 1978).

16. An IRS reopening memorandum for the taxable year ending March 31, 1970 does not show sole criminal purpose, despite Mr. Lipshy's suggestion. Indeed, while it notes a statute of limitations problem for criminal prosecution for this taxable year, it marks the potential of a

civil fraud penalty to affect liability. There is no statute of limitations for civil fraud. Similarly, the Special Agent Smith's admission that he had determined to recommend criminal prosecution does not defeat the civil inquiry. His association with others at various levels in the IRS does not show abandonment of the IRS' civil purpose. Even had a reopening been couched in solely criminal terms, however, any inference of civil purpose abandonment by the IRS is otherwise well refuted.

issued at the request of a Revenue Agent working on the civil tax determination who lacked the information in his possession. *United States v. Garrett, supra,* 571 F.2d at 1329.

Section 7602 authorizes the Secretary or his delegate to examine books, papers, records or other data that may be relevant or material to its inquiry and to issue summons

> for the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax . . ., or collecting any such liability . . .

In connection with my finding that the summons was not issued to gather evidence solely for a criminal investigation, I further find that the summons was issued for a proper purpose as permitted in section 7602.

## IV. FAILURE TO STATE A CLAIM

Mr. Lipshy has filed a motion pursuant to Rule 12(b)(6), *Fed.R.Civ.P.,* for dismissal of the IRS petition for failure to state a claim upon which relief can be granted because of its position that the petition and its supporting affidavit are deficient. Specifically, he claims that the IRS has failed to allege (1) that the investigation has a proper purpose; (2) that the information sought is relevant to the alleged purpose; (3) that the information sought is not already in the government's possession; (4) that all steps required by the Internal Revenue Code have been followed.

I have reviewed the petition and the supporting affidavit. With a view toward the rather unique nature of a summons enforcement proceeding, I find that the petition is sufficient to state a claim and therefore I conclude that dismissal should not be occasioned on this ground. *See United States v. Ladd,* 471 F.Supp. 1150 (N.D.Tex.1979).

Consequently, for the reasons expressed in this opinion, I deny enforcement of the summons.