**In re LTV SECURITIES LITIGATION.**

**MDL No. 371.**

United States District Court,
N. D. Texas,
Dallas Division.

March 23, 1981.

Jules Brody, Stull, Stull & Brody, New York City, Dean Carlton, Dallas, Tex., Abraham N. Goldman, Chicago, Ill., Leo Greenfield, North Miami, Fla., W. D. Masterson, III, Kilgore & Kilgore, Dallas, Tex., Gene I. Mesh, James W. Schlueter, Cincinnati, Ohio, Gerald Urbach, Geary, Stahl & Spencer, Dallas, Tex., Arthur N. Abbey, Stuart D. Wechsler, Kass, Goodkind, Wechsler & Labaton, New York City, for plaintiffs.

D. L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., James J. Hagan, Simpson, Thacher & Bartlett, New York City, Morris Harrell, Rain, Harrell, Emery, Young & Doke, Wilson Herndon, Strasburger & Price, Justin J. Karl, Dallas, Tex., Henry L. King, Davis, Polk, Wardwell, New York City, Jenkins & Gilchrist, Wm. Woodburn, Dallas, Tex., Peter A. White, Fulbright & Jaworski, Washington, D. C., T. Paine Kelly, Jr., MacFarlane, Ferguson, Allison & Kelly, Tampa, Fla., for defendants.

## ORDER RE ATTORNEY–CLIENT, WORK–PRODUCT AND SPECIAL OFFICER PRIVILEGES

PATRICK E. HIGGINBOTHAM, District Judge.

This securities fraud class action is being prosecuted by a certified class of buyers and sellers of various securities of LTV, Inc. against LTV, its steel subsidiary, Jones & Laughlin Steel Co. ("J&L"), LTV's accountants, Ernst & Whinney ("E&W") (formerly Ernst and Ernst) and various individuals who served as officers, directors or underwriters of LTV and J&L [during the three-year period of questioned accounting.] *See In re LTV Securities Litigation*, 88 F.R.D. 134 (N.D.Tex.1980).

The class alleges violations of the federal securities laws in connection with open market transactions in eight classes of LTV securities over a three year period beginning in 1974 and ending on July 17, 1978. At the core of the consolidated complaint is the claim that Defendants engaged in a "scheme and conspiracy" to defraud shareholders by overvaluing the inventories of J&L through a series of accounting manipulations.

LTV has refused to disclose certain information sought by the class, asserting both attorney-client and work-product privileges. The disputed discovery includes answers to deposition questions put to LTV's Vice President-Controller James F. Powers and documents submitted for *in camera* inspection. Anticipating additional claims of privilege, the class also requests a framework for future discovery.

### Hiring Lawyers

The timing of LTV's decision to consult counsel in response to the events triggering this lawsuit bears closely on the validity of its current claims of privilege. Davis, Polk and Wardwell ("Davis Polk"), a New York City law firm, was hired near November 8, 1977, an engagement apparently triggered by service of SEC subpoenas on LTV, J&L

and E&W. Davis Polk represented LTV during the SEC's investigation of LTV's methods of accounting for inventories of J&L Steel and superintended an intensive examination of LTV's files and financial procedures. LTV's Senior Vice President and General Counsel, G. Emmett Smith, Esq., his staff, and counsel for E&W, the Pittsburg law firm of Kirkpatrick, Lockhart, Johnson & Hutchison ("Kirkpatrick Lockhart") worked together in this task.

LTV's Vice President-Controller James F. Powers assisted, at the specific direction of LTV's chief executive officer. Powers' assignment included aiding attorneys in understanding the accounting in addition to reviewing certain prior financial statements of LTV and J&L. Powers was not employed by LTV during the period of questioned procedures, having joined LTV in July, 1977.

As described more fully in this court's opinion on class certification, LTV announced on July 17, 1978 that trading in its securities would be suspended for 10 days due to possible adjustments of the value of J&L's inventories as then reflected on LTV's books. Predictably, the responsive suits were not long in coming. Eleven days later the "Bronheim" shareholders filed suit and Davis Polk's employment was expanded to include the defense of LTV and J&L in the new shareholders' suit, as was Kirkpatrick Lockhart's representation of E&W. On October 13, 1978 LTV announced a restatement of earnings for the years 1974 through 1977. The SEC investigation continued throughout 1978 culminating on October 16, 1978 with the filing in the Northern District of Texas of a complaint and consent decree against LTV, J&L and James Paulos.

All discovery requested by the class and here disputed is of information generated by LTV after the SEC investigation in November 1977. And throughout, LTV has been under the protective wing of its able legal hens. Not surprisingly, LTV asserts attorney-client and work-product privilege in resisting disclosure of the following information: (1) the identity of an SEC "informant"; (2) the identity of "key" documents which formed the basis for the suspension of trading of LTV securities on July 17, 1978 and the restatement of earnings on October 13, 1978 (hereafter referred to as "additional materials"); (3) the content of conversations with Frank Wozencraft, a special officer;[1] (4) the nature of Davis Polk's review; (5) the unexpurgated minutes of certain LTV Board and Audit Committee meetings at which counsel for E&W was present; (6) LTV General Counsel Smith's "Report on SEC Private Investigation" presented to the LTV Board of Directors on December 9, 1977; (7) conferences between Smith and Powers regarding the naming of Paulos as a defendant; (8) the documents contained in Powers's "Privilege Folder" and (9) the unexpurgated minutes of certain Board of Directors and Audit Committee meetings. We will deal with the application of attorney-client and work-product privilege before turning to the relatively unique task of deciding what privilege equipment ought to be issued to the player of this newly created position of "special officer."

## I. Attorney-Client Privilege

One of the central questions here presented concerns the ability of corporate management to assert a privilege against the discovery demands of the corporation's own stockholders. Answering the stockholders' rather awkward request requires two levels of inquiry: first whether the information sought would be privileged from disclosure to strangers and second, if so, whether there is "good cause" for overriding it where stockholders bring suit. See, Garner v. Wolfinbarger, 430 F.2d 1093 (5th Cir. 1970), cert. denied 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); Panter v. Marshall Field & Co., 80 F.R.D. 718 (N.D.Ill. 1978); Cohen v. Uniroyal, Inc., 80 F.R.D. 480 (E.D.Pa.1978).

The hoary rule is that the attorney-client privilege shields confidential

---

1. Mr. Wozencraft's role is discussed at p. 614, *infra*.

communications between an attorney and client made for the purpose of furnishing or obtaining professional legal advice and assistance. McCormick, *Evidence*, § 95; 8 Wigmore, *Evidence*, §§ 2292, 2311. It is recognized as an exception to a tradition, if not principle, of entitlement to every man's evidence because the courts have been persuaded that confidentiality promotes the free communication necessary to render effective legal assistance. *Upjohn Co. v. United States*, — U.S. —, 101 S.Ct. 677, 681, 66 L.Ed.2d 584 (1981). Underlying all, of course, is that the privilege represents a value assignment of the roles of lawyers in our dispute resolution mechanisms; that is, recognition of the privilege carries with it both a recognition that the lawyer's role is critical to private ordering and that the privilege is so essential to the lawyer's task that it has the same value as the lawyer's role itself. At the same time, this tension between our commitments to both openness and private ordering requires a rule of construction that the privilege is to be construed "no more broadly than is necessary to effectuate its purpose." *Cohen v. Uniroyal, supra* at 483; *Cf. Garner v. Wolfinbarger, supra* at 1100. The commitment to truthseeking finds expression in a subsidiary procedural requirement that the burden of proof is on the individual asserting the privilege to establish the elements necessary to support a claim of privilege. *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978) *cert. denied* 439 U.S. 829, 99 S.Ct. 105, 58 L.Ed.2d 123 (1978); *United States v. Johnson*, 465 F.2d 793 (5th Cir. 1973).

The rote prerequisites for a valid assertion of privilege have been frequently stated and this circuit has adopted them. They were best stated by Judge Wyzanski in *United States v. United Shoe Machinery Corp.*, 89 F.Supp. 357 (D.Mass.1950), whose formulation requires that all of the following conditions be met:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*See United States v. Kelly, supra. In re Grand Jury Proceedings*, 517 F.2d 666, 670 (5th Cir. 1975) *quoting United Shoe Machinery, supra*, 89 F.Supp. at 358. The first element not being immediately at issue, we turn to the next and examine them seriatim.

1. *Whether Counsel Were Acting as Attorneys.*

■ There is little question but that Davis Polk was retained in late 1977 to act as attorney for LTV. *In Camera* Affidavits of Henry L. King and James F. Powers. Retained shortly after the SEC served subpoenas on LTV, J&L and E&W, the firm's work included review of files to respond to the subpoenas, interviews with company personnel to understand what had transpired and the accounting issues involved, and negotiations with the SEC aimed at reaching a settlement. Davis Polk was also retained to represent LTV and J&L in the Bronheim civil litigation instituted on July 28, 1978 while the SEC investigation was in progress. Throughout, Davis Polk was called upon to formulate legal advice and render opinions to the management and directors of LTV. As to these activities there is no question but that the lawyers were acting as lawyers.

Relying on *Osterneck v. E. T. Barwick Industries*, 82 F.R.D. 81 (N.D.Ga.1979), the class argues the privilege is inapplicable because Davis Polk attorneys performed an investigative rather than strictly legal function; that information obtained from such factual investigations undertaken by attorneys should not be privileged if either the information is needed by corporate management in the normal course of business, re-

gardless of whether management seeks legal advice upon that information, or if the investigative services could as well have been provided by lay investigators. *Plaintiffs Memorandum* at 34.

Neither of these arguments is persuasive. Information gathered in such a manner as to be privileged does not become discoverable solely because management makes other business use of the information. Of course, whatever the use made of such privileged information, it must have been handled in a confidential manner; and, of course, this tolerance of use assumes that the reason for gathering the data was to furnish legal advice. Davis Polk unquestionably conducted its investigation with the purpose of using the findings as a foundation from which "to evaluate and draw conclusions as to the propriety of past actions and to make recommendations for possible future courses of action." *See Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 610 (8th Cir. 1978). *See also United States v. Lipshy, supra*, 492 F.Supp. 35 at 41. Moreover, while in house accountants or lay investigators could have been employed to investigate the events in question, neither would have brought to bear the same training, skills and background possessed by attorneys and necessary to make the professional independent analysis and legal recommendations sought by the LTV Board of Directors. *See Diversified Indus., Id.* at 610. Indeed, when upholding the availability of the attorney-client privilege for investigative inquiries in *Upjohn*, the Supreme Court declared:

> . . . the privilege exists to protect not only the giving of professional advice . . . but also the giving of information to the lawyer to enable him to give sound and informed advice. . . . The first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant. (citations omitted).

Nothing in *Osterneck v. E. T. Barwick Industries, supra* 82 F.R.D. 81, is inconsistent with recognition of an attorney-client relationship in this case. The court in *Os-*

*terneck* found that the special counsel employed there "was not established to chart new courses for the corporation, nor was the Special Counsel retained for the value of his legal services." *Id.* at 85. Unlike *Osterneck*, here there is no reason to doubt Mr. King's statement that Davis Polk was retained to develop legal positions for, and to render legal advice to, LTV. *In Camera Affidavit of Henry L. King.*

■ Nor does the participation of house counsel alter this result. The privilege attaches equally to LTV's General Counsel Smith and his staff who were also performing services of a legal nature and furnishing legal advice during the course of the SEC investigation. Whatever doubt may have existed, *Upjohn* laid to rest suggestions that House Counsel are to be treated differently from outside counsel with respect to activities in which they are engaged as attorneys. House Counsel here assisted Davis Polk in its investigation of LTV and J&L after accounting improprieties were alleged by the SEC. Smith frequently rendered legal advice to LTV's management concerning the investigation, questions of settlement with the SEC, and the Bronheim litigation. Smith's communications made for the purpose of securing legal advice and rendered in his capacity as General Counsel, therefore, come within the attorney-client privilege.

2. *Whether the Communications were between Attorney and Client.*

■ Attorney-client privilege questions in corporations have long been plagued with uncertainty as to client identity, leaving attorneys at sea with such basic questions as which corporate personnel may be consulted in confidence. *Upjohn Co. v. United States, supra* 101 S.Ct. at 681; *Garner v. Wolfinbarger, supra*, 430 F.2d at 1097 n.10; *Radiant Burners, Inc. v. American Gas Ass'n*, 320 F.2d 314 (7th Cir.) *cert. denied* 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963).

While not every communication from corporate personnel to a corporation's attorney will be deemed a privileged communication

from the corporate "client," *Upjohn* establishes that the communications considered here are encompassed by the attorney-client privilege. In *Upjohn* the Court made clear that the attorney-client privilege applies to communications made by corporate employees concerning matters pertinent to their job tasks, regardless of echelon, if sought by the corporation's attorney in order to formulate and render legal advice to the corporation. *Id.* 101 S.Ct. at 681–686. The situation presented in *Upjohn* is analogous to that considered here. There, information was sought and obtained by house and outside counsel from numerous employees as part of an internal investigation of "possibly illegal" payments to foreign government officials. The employees' responses to written inquiries and interviews were held privileged by the Court because requested and tendered on behalf of the corporation to enable counsel to give the corporation legal advice. *Id.* 101 S.Ct. at 684. The information gathered in the course of LTV's internal investigation of possibly improper accounting procedures was sought for a similar purpose. It follows that the communications to counsel of all LTV employees, if solicited to facilitate legal advice, are protected by the attorney-client privilege.

One of the concerns expressed by persons who advocate limiting the corporate client to the "control group" is that to do otherwise increases the risk that an attorney can be used to shield information by routing data through him. More pointedly, they fear the investigative role can be abused. Implicit in that concern is doubt that the requirement that the information gathering be for the purpose of rendering legal advice adequately screens out abuses of the privilege. Voicing a similar complaint, the class here charges that LTV is attempting to shield key information by funneling it through counsel to corporate management, citing as an example of such "stonewalling" Powers' refusal to disclose the identity of the SEC informant on grounds that he only learned of this fact when told by counsel.

In dealing with this problem, it is helpful to separate the flow of information from client-to-attorney from that of attorney-to-client. In theory, the client states facts and the attorney gives advice; and in theory, if the advice to the client does not reveal what the client told him it is not privileged. Indeed, some courts have so held. *See, e. g. Mead Data Central, Inc. v. United States Dept. of Air Force*, 566 F.2d 242, 254 (D.C.Cir.1977); *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508 (D.Conn.1976); *appeal dismissed* 534 F.2d 1031 (2d Cir. 1976); *J. P. Foley & Co. Inc. v. Vanderbilt*, 65 F.R.D. 523, 526 (S.D.N.Y.1974). These courts have noted that advice given by a lawyer to his client is privileged only if the advice is based on, or would reveal, confidential information furnished by the client. Whatever the conceptual purity of this "rule," it fails to deal with the reality that lifting the cover from the advice will seldom leave covered the client's communication to his lawyer. Nor does it recognize the independent fact gathering role of the attorney. Finally, enforcement of the rule would be imprecise at best, leading to uncertainty as to when the privilege will apply. Yet, the predictability of confidence is central to the role of the attorney. Adoption of such a niggardly rule has little to justify it and carries too great a price tag. A broader rule prevails in the federal courts; a rule that protects from forced disclosure any communication from an attorney to his client when made in the course of giving legal advice. *See, e. g. Natta v. Hogan*, 392 F.2d 686, 692–93 (10th Cir. 1968); *Schwimmer v. United States*, 232 F.2d 855, 863 (8th Cir.) *cert. denied* 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956) *8 in 1 Pet Products, Inc. v. Swift & Co.*, 218 F.Supp. 253 (S.D.N.Y.1963); 8 Wigmore, *Evidence* § 2320 at 628 (McNaughten rev. 1961); Weinstein & Berger, *Weinsteins Evidence*, Vol. 2, ¶ 503(b)[03] (1980). This Circuit's position is not clear, but the citation in *Garner v. Wolfinbarger, supra*, 430 F.2d at 1096, n.7 to *8 in 1 Pet Products, Inc.* and 8 Wigmore, *Evidence* § 2320 suggests that the broader rule has been adopted.

As stated, we think the broader rule better serves the interests underlying the attorney-client privilege and is not inconsistent with the principle that the attorney-client privilege should be construed narrowly. *Cf. Garner v. Wolfinbarger, Id.* at 1101. The free interchanges between attorney and client which are necessary for counsel to formulate legal advice and which are fostered by the attorney-client privilege would be constricted severely were clients or attorneys required to disclose advice of counsel not based on privileged communications from the client. Confidentiality is necessary whether counsel's advice is based on a privileged source or not.

Finally, and most important, is that recognition of the broader rule does not tolerate attorneys acting as conduits for unprivileged information. Under this approach an attorney can be asked directly about the substance of unprivileged communications received from third parties and cannot resist disclosure on grounds that such information was later conveyed to the client unless, of course, this information was obtained by the attorney as part of an investigation necessary to give legal advice. To the extent prior decisions have denied privilege to such data they must give way to *Upjohn.* The linchpin of privilege then is not necessarily whether the facts were relayed from attorney to client because they can be privileged under *Upjohn* even if they were not. Instead, the focal point is the purpose of the lawyer in gathering the data. Finally, it must be kept in mind that a fact which comes into an attorney's knowledge under circumstances that place it outside the zone of protection *Upjohn* affords to fact-finding necessary to give legal advice is not privileged. But because that fact is not privileged, it does not follow that the attorney can be required to tell whether he told his client of that fact.

▉ The bulk of the information which the Defendant has refused to disclose on grounds of attorney-client privilege falls into two broad categories: reports and other communications from counsel to LTV's Board of Directors and Audit Committee;

and communications from counsel to James F. Powers, Vice President-Controller of LTV. From what has been stated, these communications constitute advice of counsel or an exchange of information necessary to formulate or evaluate legal advice, and are protected by the attorney-client privilege. At the same time, however, as the court in *Upjohn* noted, "[t]he privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney."

▉ Last, and at the risk of confusing by stating the obvious, information concerning the factual circumstances surrounding the attorney-client relationship has no privilege, at least so long as disclosure does not threaten to reveal the substance of any confidential communications. *See Wirtz v. Fowler,* 372 F.2d 315, 332 n.36 (5th Cir. 1966); *Diversified Indus., Inc. v. Meredith, supra,* 572 F.2d at 603; *In re Semel,* 411 F.2d 195, 197 (3rd Cir.) *cert. denied,* 396 U.S. 905, 90 S.Ct. 220, 24 L.Ed.2d 181 (1969); *Colton v. United States,* 306 F.2d 633, 637 (2d Cir. 1962) *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). The attorney-client privilege does not encompass such nonconfidential matters as the terms and conditions of an attorney's employment, the purpose for which an attorney has been engaged, the steps which an attorney took or intended to take in discharging his obligation, or any of the other external trappings of the relationship between the parties. *Diversified Indus. Id., Cohen v. Uniroyal, Inc., supra,* 80 F.R.D. at 483. Thus, the court rejects Defendants' claim of privilege concerning information revealing the general nature of the review LTV's counsel was requested to make. *See* Deposition of James F. Powers at 165, 168.

3. *Whether the Communications were Confidential.*

▉ In order for the privilege to attach to an attorney-client communication, the communication must have been made and maintained in confidence under circumstances where it is reasonable to assume

that disclosure to third parties was not intended. *United States v. Pipkins*, 528 F.2d 559, 563 (5th Cir. 1976); *United States v. Blackburn*, 446 F.2d 1089, 1091 (5th Cir. 1971) *cert. denied* 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972). The class argues that no privilege attaches to remarks of LTV's counsel, or otherwise privileged communications, made in the presence of E&W representatives. Defendants counter with the "joint defense privilege" which extends the attorney-client privilege to communications made in the course of joint defense activities.

Federal courts, including the Fifth Circuit Court of Appeals, have endorsed the joint defense exception to the general rule that no privilege attaches to communications made in the presence of third parties. We agree with Defendants that disclosure of privileged information by an attorney to actual or potential co-defendants, or to their counsel, in the course of a joint defense does not constitute a waiver of the attorney-client privilege. *See, e. g. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir. 1977); *Hunydee v. United States*, 355 F.2d 183 (9th Cir. 1965); *Continental Oil Co. v. United States*, 330 F.2d 347 (9th Cir. 1964); *In the Matter of a Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381 (S.D.N.Y.1975).

For the purposes of the joint defense privilege, the term co-defendant is broadly construed. The privilege is available to co-respondents in a grand jury investigation as well as to parties made co-defendants by formal indictment *Continental Oil Co., supra* 330 F.2d at 348–49. The privilege also protects from disclosure communications between various co-defendants and their attorney's in a civil proceeding. *Abraham Construction Corp., supra* 559 F.2d at 253. *Abraham Construction* did not restrict applicability of the privilege to criminal co-defendants, as the class contends, but rather specifically approved the doctrine in the context of a civil suit alleging conspiracy. *Id. See also, In the Matter of a Grand Jury Subpoena Duces Tecum Dated November 16, 1974, supra*, 406 F.Supp. at 388 (joint defense privilege applicable to interviews and discussions prompted by an SEC investigation and threat of civil action).

The joint defense privilege encompasses shared communications " . . . to the extent that they concern common issues and are intended to facilitate representation in possible subsequent proceedings." *Hunydee, supra* at 185. It is also essential that the co-defendants have exchanged the information in confidence: "not . . . for the purpose of allowing unlimited publication and use, but rather, . . . for the limited purpose of assisting in their common cause." *Abraham Construction Co., supra* 559 F.2d at 253.

LTV has established that the joint conferences undertaken with representatives of E&W were confidential, concerned common issues, and were intended to facilitate representation in proceedings involving the SEC and potential shareholder litigants. Both LTV and E&W were subpoenaed by the SEC before the joint discussions which the class seeks to discover. As LTV's auditor, E&W reported on the financial results which were the subject of both the SEC investigation, and after July 1978, the Bronheim litigation as well. LTV and E&W had a natural and common interest in consulting about the SEC investigation and their defense to the shareholder suit. The assurance of confidentiality is as important and appropriate where a cooperative program of joint defense is helpful or necessary to represent clients whose attorneys are separately retained as it is where co-defendants have engaged common counsel. *Id.* 406 F.Supp. at 388. No policy served by the privilege is disserved by recognition of the joint defense privilege. And its recognition makes savings in expense and effort likely.

The Court finds little merit in the class' contention that the joint defense privilege does not extend to civil defendants whose liability may arise from different acts or omissions, or who may assert cross-claims against each other. Even should

such allies later become estranged, they would arguably still be entitled jointly to invoke the attorney-client privilege to protect shared confidences from disclosure at the behest of a third party. As stated in *In the Matter of a Grand Jury Subpoena Dated November 16, 1974, Id.* at 386:

> To be sure, what is divulged by and to the clients present at such a meeting cannot be deemed to be confidential *inter sese*; in any later controversy between or among those clients, the privilege could not stand as a bar to full disclosure at the instance of any one of them.... Nonetheless, in the absence of such event and in relation to the rest of the world, the attorney-client communications issuing from such a joint conference are invested with absolute secrecy. (citations omitted).

At the least, the communications made in the presence of E&W representatives after the issuance of SEC subpoenas, if otherwise privileged when made, are not to be denied privilege because of potential controversy between LTV and E&W.

The class also claims LTV impliedly waived confidentiality concerning the identity of certain "additional materials" because these materials were turned over to the SEC. *Plaintiff's Memorandum* at 13. According to LTV, however, the thirteen boxes of "additional materials" produced to the SEC on July 6, 1980 have been produced and segregated for inspection by the class representatives and have already been inspected. *Reply Memorandum* at 4.

Apparently, the class actually seeks identification of that part of the "additional materials" selected by Davis Polk for their own purposes and brought to Mr. Powers' attention by counsel before and during a meeting between LTV and E&W in late June, 1978. These documents led Powers to believe a restatement of earnings was necessary. *Plaintiff's Memorandum* at 13–15. In opposition to disclosure, LTV urges that this specific group of documents was not selectively disclosed to the SEC "... in any form other than as they existed throughout the thirteen box submission to the SEC on

July 6, 1978." *Defendant's Reply Memorandum* at 4. Some of these documents, however, were discussed at a meeting with the SEC on July 12, 1978. *Id.* at 4–5. Defendant states that no claim of privilege has been raised with respect to identification of the documents discussed with the SEC. *Id.* at 5.

This circuit's test for implied waiver was explicated in *United States v. Woodall*, 438 F.2d 1317, 1324 (5th Cir. 1970):

> ... [W]aiver by implication involves two basic elements. The first is subjective—Does the person holding the right to claim the privilege intend to waive it? The second element is objective—Is it fair and consistent with the assertion of the claim or defense being made to allow the privilege to be invoked? This objective determination should be based upon whether the position taken by the party goes so far into the matter covered by the privilege that fairness requires the privilege shall [terminate] when, subjectively, he never intended the result.

*Accord, United States v. Lipshy, supra*, 492 F.Supp. at 43–44. Applying this test to LTV's disclosure of the thirteen boxes of "additional materials" to the SEC, we conclude that LTV did not intend to waive its attorney-client privilege with respect to the sub-group of documents selected by counsel for internal discussion with LTV management. As to the objective element, LTV's production of numerous pieces of the jigsaw puzzle to the SEC is not inconsistent with its current claim of privilege with regards to the puzzle's solution. The identity of those additional materials selected by counsel for the purpose of communication with LTV, though not the underlying documents, is a privileged matter. LTV's disclosure of the additional materials to the SEC does not justify the class' discovery of the identity of those documents believed by LTV to be most important. *Cf. United States v. Lipshy, supra.*

The dispute concerning discovery of Powers' knowledge of the "additional materials" warrants similar treatment. The class claims Powers obtained knowledge of the

"additional material" from counsel in furtherance of his review of LTV's financial statements, rather than for the purpose of obtaining legal advice. The class also argues that because Powers needed to review the "additional materials" for his independent investigation, he cannot resist disclosure on grounds that the materials were brought to his attention by Davis Polk in the course of its investigation. *Plaintiff's Supplemental Memorandum* at 1–3. Throughout the SEC investigation, however, Powers served a dual role. He was assigned to assist in Davis Polk's investigation of LTV as well as to conduct his own fact-finding investigation. When Davis Polk attorneys informed Powers of the additional material they had uncovered, they did so as attorneys communicating to the representative of their corporate client and in the expectation of confidentiality. Waiver of the privilege will not be implied merely because Powers wore a different hat as an independent investigator. That Powers may also have needed the materials to complete his independent investigation does not transpose counsel's communication into a nonconfidential disclosure to a third party. Powers, however, can be required to testify which materials led him, in the course of his independent review, to conclude that a restatement of earnings was proper. *See Plaintiff's Supplemental Memorandum* at 3. But he need not identify which additional materials were discussed by counsel at meetings attended by E&W representatives during June and July of 1978.

### 4. Applicability of the "Good Cause" Exception in Shareholders' Suits.

The second question where a corporation claims the attorney-client privilege in a shareholders' suit is whether there exists "good cause" for overriding the privilege. *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970) *cert. denied* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971). The Fifth Circuit in *Garner* sanctioned assertions of attorney-client privilege by a corporate client, with the caveat that "the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 1103–04. The court listed indicia which may "contribute to the decision of presence or absence of good cause:"

> the number of shareholders and the percentage of stock they represent; the bona fides of the shareholders; the nature of the shareholders' claim and whether it is obviously colorable; the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; whether the communication related to past or to prospective actions; whether the communication is of advice concerning the litigation itself; the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons.

The court did not direct how these factors should be evaluated. But competing considerations underlying the court's adoption of the "good cause" exception provide a clue to what goals are to be furthered. The attorney-client privilege, because it is an obstacle to truthseeking, is to be construed narrowly to effectuate necessary consultation between legal advisers and clients. *Id.* at 1100–01. Before a corporate claim of privilege is recognized, the court reasoned, "the *injury* that would inure to the [attorney-client] relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation." *Id.* at 1100 *quoting* 8 Wigmore, *Evidence*, § 2285 at 527 (emphasis in original). In assessing management claims of injury to the corporation from disclosure, the court noted, account must be taken of the unique status of the corporate client. Unlike an individual client, corporate management has duties which ultimately run to the benefit of

stockholders. The interests in disclosure of some or all of the stockholders may be adverse to management who is invoking the privilege. *Id.* at 1101. The interests in disclosure of shareholder plaintiffs, however, may be inimical to nonparty minority or majority shareholders.[2] *Id.* Given these competing interests, the court concluded, management judgments, and the information and advice conveyed to management, may not be hidden absolutely "behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised." *Id.* at 1101. Rather, like the recognized exception for communications in contemplation of a crime or fraud, the attorney-client privilege must yield where "good cause" is shown.

The *Garner* court's concern that management judgments not be hidden behind a cloak of privilege can best be understood with full attention to its facts. In *Garner*, shareholders brought a class action against various directors and officers of a life insurance company alleging that certain sales of securities violated federal and state securities statutes and common law. Plaintiffs also asserted against numerous individual defendants a derivative action on behalf of the corporation. The attorney representing the corporation at the time of the questioned transactions refused to disclose on grounds of privilege advice given by him to the corporation about the issuance and sale of the stock. Significantly, the undisclosed communications to management focused on in *Garner* formed the basis for the management judgments which were challenged directly in the shareholders' civil action. *See Id.* at 1101. The information sought from the lawyer related to his activities before the shareholders' litigation and to his involvement in the very stock sale that was the subject matter of the lawsuit.

LTV urges that the types of attorney-client communications which the class seeks to discover here are materially distinguishable from those considered in *Garner* and all later cases employing the "good cause" exception to overcome a corporation's attorney-client privilege. The class here seeks after-the-fact communications concerning offenses already completed: that is, communications exchanged between the party alleged to have committed the offenses and an attorney acting in his professional capacity to represent the party in proceedings involving the alleged offenses. Unlike *Garner*, management's remedial decision in 1978 to restate LTV's prior earnings is not the act of which the class complains. Rather, analogous to the stock sales in *Garner*, the class complains of the preceding overvaluation of J&L inventory. The *Garner* decision itself suggests this time based distinction is sound. Among the factors to be considered in assessing "good cause," the court advised, were whether the communication "related to past or to prospective actions" and whether the material sought consisted of "advice concerning the litigation itself." *Id.* at 1104.

A review of the cases applying the "good cause" exception supports Defendant's temporal distinction. None of the decisions subjects post-event attorney-client communications to disclosure under the *Garner* rule. *See, e. g. Cohen v. Uniroyal, Inc.,* 80 F.R.D. 480, (E.D.Pa.1978); *Panter v. Marshall Field & Co., et al.,* 80 F.R.D. 718 (N.D.Ill.1978); *Broad v. Rockwell Int'l Corp.,* CCH Fed.Sec.L.Rep. ¶ 95,894 (N.D. Tex.1977); *Valente v. Pepsico, Inc.,* 68 F.R.D. 361 (D.Del.1975). In *Cohen*, for example, the advice of counsel sought to be discovered by plaintiff shareholders antedated the challenged conduct and bore directly upon the element of corporate scienter during the time period of the alleged

---

**2.** The Court noted:

Due regard must be paid to the interest of nonparty stockholders which may be affected by impinging on the privilege, sometimes injuriously (though not necessarily so in some situations shareholders who are not plaintiffs may benefit). The corporation is vulnerable to suit by shareholders whose interests or intention may be inconsistent with those of other shareholders, even others constituting a majority.

fraudulent action.[3] *Id.* at 484–85. Similarly in *Panter*, the court ordered disclosure of counsel's contemporaneous advice concerning a tender offer resisted by management where the defendant asserted reliance on "advice of counsel" as a major substantive defense to alleged violations of securities laws.[4] *Id.* at 723. Significantly, the court did not find "good cause" with respect to documents prepared in anticipation of the *Panter* or other "possible" shareholders litigation. *Id.* at 724. *See also, Broad v. Rockwell, supra; Valente v. Pepsico, supra.*

 Application of the *Garner* criteria here requires that LTV's claim of privilege be sustained. Forced disclosure of counsel's remedial advice would do great injury to the corporation's interest in self-investigation and preparation for litigation. *Cf. Upjohn Co. v. United States, supra* 101 S.Ct. at 684. Once accused of wrongdoing, management's need to consult counsel in confidence is self-evident. Moreover, the interests of the corporation at such time are not necessarily coincidental with shareholder plaintiffs complaining of past misconduct. The Plaintiff class is frozen when corporate wrongdoing ends. From that time on, the class interests are adverse to the corporation which has allegedly defrauded it, and possibly adverse to nonparty shareholders as well. Perhaps the deciding factor in this case, however, is the availability of the information sought by the class from other non-privileged sources. As noted in *Upjohn*, "[a]pplication of the attorney-client privilege to communications such as those involved here . . . puts the adversary in no worse position than if the communications had never taken place." *Id.* 101 S.Ct. at 686. The class may (as the class has) examine business documents, depose corporate employees as to facts learned independently from counsel's investigation, obtain pre-existing documents and financial records not prepared by counsel, and question LTV's attorneys about facts not subject to the attorney-client privilege. *See Diversified Indus., Inc. v. Meredith, supra,* 572 F.2d at 611; *Colton v. United States,* 306 F.2d 633, 639 (2d Cir. 1962), *cert. denied* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963). The greater ease of discovery and cost savings accruing from disclosure, while an admitted benefit to the class, do not so benefit the "correct disposal of litigation" with respect to the subject matter of the lawsuit as to outweigh LTV's right to consult its attorneys in confidence.[5] *See Garner, supra,* 430 F.2d at 1101. Accordingly, the "good cause" exception is found inapplicable to this case from both a factual and policy perspective.[5A]

**3.** Applying the *Garner* criteria, the court noted:

(5) The communications sought relate to the corporation's past conduct and the legal significance of accomplished acts; rather than to prospective conduct still in the sensitive planning phase.

(6) The communications sought do not concern the litigation itself. *Id.* at 485.

**4.** The substantial benefits to the truthseeking process of disclosure were outlined by the court:

Not only may such documents bear upon the defendants' good faith in seeking the advice of counsel by illuminating the type and extent of the legal advice which Marshall Field had sought and received with respect to earlier proposed business combinations, they may also illuminate the bona fides of the corporate defendants' reliance upon the advice of counsel in positing that certain proposed combinations, but not others, might run afoul of the antitrust laws. *Id.*

**5.** In *United States v. Nobles,* 422 U.S. 225, 247–48, 95 S.Ct. 2160, 2174–75, 45 L.Ed.2d 141 (1975) Mr. Justice White observed that "the injury to the fact finding process is far greater where a rule keeps *evidence* from the fact finder than when it simply keeps advance disclosure of evidence from a party or keeps him from *leads* to the evidence developed by his adversary and which he is just as well able to find by himself." (emphasis in original). The Court recently reaffirmed that considerations of convenience alone do not overcome the policies served by the attorney-client privilege: "Discovery was hardly intended to enable a learned profession to perform its functions . . . on wits borrowed from the adversary." *Upjohn Co. v. United States, supra.* 101 S.Ct. at 686.

**5A.** This analysis does not emphasize any difference in application of *Garner* between direct and derivative suits because this decision would be the same if the suit were derivative. The lack of emphasis is not because the court

### 5. Stockholders' Statutory Right of Inspection.

The class claims a statutory right to discover the "unexpurgated" minutes of Board of Directors and Audit Committee meetings, as well as other formal LTV records, pursuant to Delaware's statutory right of inspection for shareholders. Delaware Corp.Law Ann. § 220(b). Delaware's Corporation Code provides in pertinent part that:

> Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the corporation's stock ledger, a list of its stockholders and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder.

In like fashion the class relies on Pennsylvania's statutory right of inspection to compel discovery of J&L Steel's books and records. See Pennsylvania Bus.Corp. Law § 308 (1968). It further asserts a right to compel testimony and other evidence to unearth what transpired at corporate meetings.

 The class' claim that a shareholder's statutory or common law right of inspection overcomes an otherwise valid assertion of attorney-client privilege presents a question of first impression in the federal courts. Neither side has marshalled any authority for or against this novel proposition. The court has discovered several state court decisions which treat this question, albeit indirectly. State law, however, does not determine the scope of the attorney-client privilege. In this case federal law supplies the rule of decision and therefore determines its scope. *Fisher v. United States*, 425 U.S. 391, 402 n.8, 96 S.Ct. 1569, 1576 n.8, 48 L.Ed.2d 39 (1976); *United States v. Hankins*, 581 F.2d 431, 438 n.13 (5th Cir. 1978); Fed.R.Evid. 501. Since no federal common law has developed on this question, however, the court will look to state law as a useful, though not controlling, referent. *See Gannet v. First National Bank of New Jersey*, 546 F.2d 1072, 1076 (3rd Cir. 1976) *cert. denied* 431 U.S. 954, 97 S.Ct. 2674, 53 L.Ed.2d 270 (1977).

The principles generally governing inspection are well established. A qualified shareholder enjoys a near absolute right to inspect a corporation's "stock ledger" or "list of stockholders." Inspection of these documents will be bridled only upon a showing by the corporation that the shareholder's purpose is improper. *See Skoglund v. Ormand Industries, Inc.*, 372 A.2d 204, 207 (Del.Ch.1976). Because the right to communicate with other shareholders regarding matters of common interest is central to corporate democracy, the law looks more favorably upon shareholder requests for the stock register than for other company records. *NVF Co. v. Sharon Steel Corp.*, 294 F.Supp. 1091, 1093 (W.D.Penn.1969) *citing Goldman v. Trans-United Indust's Inc.*, 404 Pa. 288, 292–293, 171 A.2d 788 (1961). Thus, where inspection of corporate "books and records" other than the stock ledger or stockholder list is sought, the burden shifts to the shareholder to establish a proper purpose. *Skoglund, supra* at 207. Moreover, even though a shareholder's purpose may otherwise be proper, the right to inspect other books and records must be balanced against the interests of the corporation in nondisclosure. *See State v. Gulf Sulphur Corp.*, 231 A.2d 470, 473 (Del.1967). "To this extent," the Delaware Court of Chancery noted, "a stockholder's right of inspection is a qualified right depending upon the facts of the particular case." *Skoglund, supra* at 207. *See also, Riser v. Genuine Parts Co.*, 150 Ga.App. 502, 258 S.E.2d 184 (1979). Indeed, Delaware law specifically provides that in a stockholder's suit, "The Court may, in its discretion, prescribe any limitations or conditions with reference to the inspection . . . ." 8 Del.Ch.

---

believes the distinction to be always irrelevant but because it was not necessary here to the discovery decision made. And we plainly need no further excursions.

**610**

§ 220(c); *see Henshaw v. American Cement Corp.*, 252 A.2d 125 (Del.Ch.1969).

At the outset, the court notes that the minutes sought constitute "other books and records" to which shareholders do not have an unfettered right of access. The class, however, has met its threshold burden of proving "proper purpose." Under the common law of Delaware and Pennsylvania, as well as other states, both shareholder litigation against the corporation, or its directors, and shareholder investigation of improper corporate management are deemed proper purposes. *See, Nodana Petroleum Corp. v. State*, 123 A.2d 243, 246 (Del.1956) *accord Skoglund v. Ormand Indust's, supra; Taylor v. Eden Cemetery Co.*, 337 Pa. 203, 10 A.2d 573 (Pa.1940); *see generally* Annot., 15 A.L.R.2d 11 (1951). We proceed then, directly to the task of balancing the inspection rights of the class against Defendants' interests in nondisclosure of communications protected by the attorney-client privilege.

The few courts asked to perform this balancing function have identified a number of corporate interests which weigh against disclosure. Included are whether granting the requests would violate principles of confidentiality, lead to legal difficulties with federal agencies, or give an unfair advantage to the petitioning stockholders, *see Riser v. Genuine Parts Co.*, 150 Ga.App. 502, 258 S.E.2d 184 (1979); whether disclosure might reveal trade or business secrets of the corporation, *see State v. Gulf Sulphur Corp.*, 231 A.2d 470, 473 (Del.1967); and whether inspection would amount to "back-door discovery unbound by work-product, privilege or any other limitation upon discovery" *see Henshaw v. American Cement Corp.*, 252 A.2d 125 (Del.Ch.1969); *see also Weck v. District Court of the Second Judicial District*, 158 Colo. 521, 408 P.2d 987 (1966).

Without exception, the state courts have upheld corporate resistance to shareholder's demands to inspect privileged documents. Apparently, however, no court has considered a demand to inspect minute books in this context. Most closely on point is *Weck v. District Court of the Second Judicial District, Id.* There, shareholders of Synkoloid Corporation charged the Directors of Clute Corporation and Clute's accountants with fraud and conspiracy to defraud Synkoloid's shareholders in connection with a merger between the two corporations. The plaintiffs, who had become shareholders of Clute pursuant to the merger, demanded to inspect various financial documents possessed by Clute's accountants. The Colorado Supreme Court upheld the defendants' assertion of accountant-client privilege to defeat the shareholder's inspection rights. Plaintiffs' statutory right of inspection, the Court declared, ". . . does not operate to nullify the provisions of the witness statute." The court explained that the confidential relationship existing between the accountants and the corporation came into being only as a matter of contract between the accountants and the authorized management of the corporation and, therefore, the protection of the witness statute could only be waived "by those duly constituted officers who are charged with the responsibilities of managing the affairs of the corporate entity."

In like fashion are *Riser v. Genuine Parts Co.*, 150 Ga.App. 502, 258 S.E.2d 184 (Ct. App.1979) and *Henshaw v. American Cement Corp.*, 252 A.2d 125 (Del.Ch.1969). In *Riser*, the Georgia Court of Appeals upheld on grounds of privilege the trial court's refusal to require inspection by shareholders of confidential legal opinions and attorneys' work papers and files relating to the investigation of the corporation by the Federal Trade Commission.[6] In *Henshaw*, the Delaware Court of Chancery refused to compel inspection of documents by a corpo-

**6.** Arguably, *Riser* is distinguishable because the minutes of Board of Directors meetings had been disclosed voluntarily. However, unlike the Delaware and Pennsylvania statutes, under Georgia's Corporation Code, Board minutes are listed as a core statutory object of inspection akin to stockholders' lists and no claim of attorney-client or work-product privilege was asserted with respect to such records in the case.

rate director's attorneys where the attorneys simultaneously represented persons defending against a separate fraud suit brought by the corporation. While permitting the director to inspect in his own right in preparation for a proxy contest,[7] the court stated:

> But it begs common sense and elemental notions of fairness to say that the Corporation must submit its records (including those dealing with the very substance of the fraud suit . . .) for inspection by a person whose interest in pending litigation is adverse to the corporation. . . . This would indeed be backdoor discovery unbound by work-product, privilege or any other limitation upon discovery.

Implicit in the limitation order was the court's recognition that evidentiary privileges are not subsidiary to shareholder's inspection rights. *Cf. Goldstein v. Lees*, 120 Cal.Rptr. 253, 46 Cal.App.3d 614, 622 (Ct. App.1975) (*dictum*) (irrespective of shareholder's inspection rights, since a communication coming from a shareholder would not be privileged as a corporate communication, logically the privilege may be invoked "against all those whose communications are not covered by the scope of the privilege—among others, the stockholders of the corporation.") *Citing* Comment, 69 Colum. L.Rev. 309, 318 n.39 (1969).

The class has produced no valid authority, and we have found none, granting shareholders access to privileged corporate communications pursuant to a state inspection statute.[8] The cases teach that a court should exercise its discretion in a fashion analogous to that of the "good cause" exception of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert. denied* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971).[9] For the same reasons we decline to order disclosure under the *Garner* principle, we decline to order it here. Corporate minutes are a record of matters discussed. While useful to shareholders desiring to investigate suspicions of corporate mismanagement, Board minutes are not inherently more useful for this purpose than any other documents shareholders might seek. Neither do minutes of the Board of Directors possess a sacred character akin to the stockholder's list which shareholders may inspect as a matter of right. If directors may confer with counsel in confidence, and no one argues that an attorney-client privilege is simply not available, there is little reason to deny confidentiality to a recordation of the confidences. Again, no special need for the corporate minutes or a lack of other means to obtain the underlying information sought has been shown.

## II. The Work-Product Privilege

LTV has claimed the work-product privilege as a further ground for resisting disclosure of information. *See, e. g. Hickman v. Taylor*, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Now codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, the work-product rule provides:

> (3) Trial Preparation: Materials.
>
> Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and *prepared in anticipation of litigation or for trial by or*

---

7. The director's demand for inspection in *Henshaw* presented a stronger case for disclosure than here. The director there was not personally involved in litigation as a party adverse to the corporation, was already privy to corporate confidences, and owed a fiduciary duty to the corporation which, if violated, could be remedied by other means. As a general rule, corporate directors have a greater right to acquire corporate information than do shareholders who lack any fiduciary obligation to the corporation. *See Goldstein v. Lees*, 120 Cal.Rptr. 253, 46 Cal.App.3d 614, 621 (Ct.App.1975).

8. The only decision to the contrary, *Radiant Burners, Inc. v. American Gas Ass'n*, 207 F.Supp. 771, 775 (N.D.Ill.1962) was reversed by the Seventh Circuit, 320 F.2d 314 (7th Cir.) *cert. denied*, 375 U.S. 929, 84 S.Ct. 330, 11 L.Ed.2d 262 (1963).

9. Indeed, in formulating the "good cause" exception, the Fifth Circuit in *Garner* looked to the shareholder's qualified right of inspection as a model for its balancing approach. *See Id.* at 1104 n.21.

*for another party or by or for that other party's representative* (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. (emphasis added)

### Foreseeability of Suit

■■■■ Counsel's efforts on LTV's behalf were motivated by the anticipation of future litigation, a requirement under the work-product doctrine. *J. H. Rutter Rex Mfg. Co. v. NLRB*, 473 F.2d 223, 234 (5th Cir. 1973); *United States v. Lipshy, supra* 492 F.Supp. at 44. From the moment the SEC investigation commenced with the issuance of subpoenas in November 1977, LTV was virtually assured of a civil suit. Indeed, confirmation of this prospect was quick in coming as evidenced by the institution of the Bronheim litigation on July 28, 1978. *Cf. United States v. Lipshy, Id.* at 45; *Home Ins. Co. v. Ballenger Corp.*, 74 F.R.D. 93 (D.Ga.1977); *Zenith Radio Corp. v. Radio Corp. of America*, 121 F.Supp. 792 (D.Del. 1954). That some of the reports of counsel to the Board and Audit Committee occurred before the actual filing of the Bronheim or SEC lawsuits does not deny the work-product privilege to those reports. *Diversified Indus., Inc. v. Meredith, supra*, 572 F.2d at 604. Investigation by a federal agency presents more than a "remote prospect" of future litigation and gives grounds for anticipating litigation sufficient for the work-product rule to apply. *See, e. g. In re Grand Jury Subpoena*, 599 F.2d 504 (2d Cir. 1979); *Diversified Indus., Inc. v. Meredith,*

*Id.* at 604; *United States v. Lipshy, supra.* Moreover, the work-product need not have been generated in anticipation of the specific litigation during which the privilege is claimed. As stated in *Panter v. Marshall Field & Co., supra*, 80 F.R.D. at 724:

... the weight of modern authority supports the conclusion that the work-product privilege extends to documents prepared in anticipation of prior, terminated litigation, regardless of the interconnectedness of the issues or facts. *E. g., In re Murphy*, 560 F.2d 326, 333–35 (8th Cir. 1977) (cases cited therein).

*See also*, 8 Wright & Miller, *Federal Practice & Procedure*, § 2024 at 200–01. The issues and facts focused on in the prior SEC investigation and complaint, in any case, are directly connected to this suit.

■■■■ The work-product privilege protects a broader spectrum of materials than the attorney-client privilege. By Rule 26(b), the concept of work-product is not confined to information or materials gathered by an attorney. *Diversified Indus., Inc. v. Meredith, supra*, 572 F.2d at 603. Included are documents and things prepared or obtained because of the prospect of litigation "by or for" the party or the party's representative, who need not be an attorney.[10] *Id., Osterneck v. E. T. Barwick Indus.*, 82 F.R.D. 81, 87 (N.D.Ga.1979); Fed. R.Civ.P. 23(b)(3); 8 Wright & Miller, *Federal Practice & Procedure*, § 2024 (1970). The scope of coverage, however, is not without limits. To the extent documents are "assembled" by or for a party or his representative into a meaningful product, the contents of that assemblage is work-product sheltered from disclosure. But merely securing documents or records in the role of an attorney and in anticipation of possible litigation does not remove such materials from discovery upon a proper request. *United States v. Lipshy, supra*, 492 F.Supp. at 45.

---

**10.** Rule 23(b)(3) lists as included representatives a party's attorney, consultant, surety, indemnitor, insurer, or agent.

■ In order to overcome the work-product privilege, the party seeking discovery must demonstrate "substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R.Civ.P. 23(b)(3). The burden of proving "substantial need" is on the party seeking disclosure. *Hickman v. Taylor, supra,* 329 U.S. at 511, 67 S.Ct. at 393.

■ The class here has not made the required showing. Appraised frankly, the class is attempting to capitalize on LTV's self-evaluation of its past financial practices rather than to evaluate those practices itself. Returning to an earlier metaphor, LTV has already furnished the pieces of the jigsaw puzzle and the class must find the alleged solution, if one exists, on its own. Nothing has been withheld which LTV has not already produced, or is willing to produce, in another form. At most, the record suggests the items sought would be helpful to the class, but contain nothing of substance which cannot be or has not been discovered by other means.

### III. *Application of the Privileges to the Class' Discovery Requests*

With these principles in mind, we pass to a consideration of LTV's claims of attorney-client and work-product privilege for each item at issue.

*Item 1.* Powers' knowledge of the identity of the SEC informant is arguably subject to the attorney-client privilege since Powers only learned of this fact from Davis Polk. Because the class's counsel stated in conference that it has learned the identity of the informant from other sources, this claim of privilege need not be resolved.

*Item 2.* The identity of the key documents ("additional materials") which formed the basis for LTV's suspension of trading and restatement of earnings comes within both the attorney-client and work-product privileges. The attorney-client privilege protects Powers' knowledge of these matters because the identity of the additional materials was communicated to

him by Davis Polk in his capacity as a responsible representative of LTV assigned to assist counsel. Alternatively, the choice of materials termed "additional materials" are protected by the attorney-client privilege because they were assembled by Davis Polk for the purpose of advising LTV in anticipation of litigation involving the SEC and, for relevant periods, the "Bronheim" plaintiffs. A fortiori they enjoy a work-product privilege. Because they are ordinary business records, the documents themselves must be (and have been) tendered, but LTV's collations or choices of samples need not be identified specifically by Powers or other representatives of LTV.

*Item 3.* The special officer discovery is treated separately, *infra* at 614.

*Item 4.* As previously discussed *supra* at pp. 603–604, the general nature of Davis Polk's investigation of LTV and related matters regarding the terms under which Davis Polk was retained are not privileged and must therefore be disclosed.

*Item 5.* The presence of E&W at certain discussions and Audit Committee Meetings did not result in a waiver of confidentiality because LTV and E&W were joint defendants. Matters communicated by, or in the presence of, E&W or its counsel regarding the "additional materials" otherwise privileged are protected from disclosure by the attorney-client privilege.

*Item 6.* General Counsel Smith's "Report on SEC Private Investigation" presented to LTV's Board of Directors on December 9, 1977 is immune from discovery under both the attorney-client and work-product privileges. The report was a communication from counsel to client generated by an original purpose of securing legal advice and was also work-product material prepared by counsel in anticipation of litigation.

*Item 7.* The conferences between General Counsel Smith and Powers regarding the naming of Paulos as a defendant were confidential communications between attorney and client made for the purpose of securing legal advice and are therefore protected under the attorney-client privilege.

*Item 8.* The documents contained in Powers' "Privilege Folder" are protected from disclosure by both privileges. They constitute the notes of discussions between client and attorney as well as materials prepared by LTV's representative in anticipation of litigation.

*Item 9.* Board Minutes have been otherwise specifically discussed.

## IV. *Discovery of the Special Officer*

The class seeks to depose Frank M. Wozencraft,[11] the Special Officer retained by the Audit Committee of LTV. It also seeks all documents submitted to or prepared by or for Wozencraft. In light of defendants' colorable privilege assertions, this court requested briefs and vacated plaintiffs' Notice of Deposition of Wozencraft.

Wozencraft's appointment as Special Officer is in accordance with the provisions of a Final Judgment entered by Judge Taylor of this court on October 16, 1978 ("Final Judgment") (*see* Appendix). That Judgment, in the nature of a consent decree between the SEC, LTV, J&L and Paulos, enjoins LTV and J&L from violating certain provisions of the federal securities laws. It orders LTV and J&L to investigate practices leading to the SEC Complaint and conduct of their personnel involved in those practices. The Final Judgment contemplates that the investigation is to be conducted by the Special Officer, who will report to the Audit Committee. The Audit Committee, in turn, is to make its recommendations to the Board of Directors of LTV concerning questionable accounting and auditing practices and whether any action should be brought against any director, officer or employee for material misconduct.

Defendants argue that the Special Officer's role is in essence that of an attorney retained to provide legal advice, and that both the attorney-client and work product privileges bar the class' attempted discovery. The class denies that the Special Officer is functioning as an attorney, and argues that neither privilege applies because the Special Officer's services are primarily investigative in nature, were not retained voluntarily, and will not be kept confidential.

### 1. *Characteristics of the Special Officer.*

Defendants do not seriously contend that the relationship of the Special Officer to LTV is typical of that of the ordinary investigative counsel to his client. Rather, they assert that the relationship is sufficiently analogous to the conventional attorney-client model to warrant the assertion of the two privileges, and that there are compelling reasons to apply the privileges even where divergence from the traditional paradigm is wider.

There are important differences between the role of the Special Officer and that of the ordinary counsel. Unlike the situation typically presented where counsel has been hired in anticipation of civil or criminal liability, *see, e. g., Diversified Indus., Inc. v. Meredith, supra; Byrnes v. IDS Realty Trust,* 85 F.R.D. 679 (S.D.N.Y.1980), the Special Officer here was retained by LTV to implement an SEC consent decree. Atypically, LTV, the "client," is not the final arbiter of the Special Officer's duties, functions or authority. That power is held by the court, which may resolve any disagreement between LTV and the Special Officer concerning his duties, functions or authority. The Final Judgment identifies certain duties owed to the Special Officer. LTV must "cooperate fully" with the Special Officer, may not assert against the Special Officer any corporate privilege except as to matters prepared for or by LTV in the course of the SEC investigation, and must authorize the directors, officers, employees and agents of LTV to testify under oath and provide all requested information.

In addition, the Special Officer has obligations toward the SEC which may conflict

---

11. Wozencraft is a member of the Houston law firm of Baker & Botts. He is being assisted by members and associates of Baker & Botts, as well as by an independent certified public accountant and a public accounting firm.

with the normal duties owed a client by private counsel. At the Commission's discretion, he must furnish the SEC any documents, statements or other information in his possession as well reports or recommendations he prepares prior to submitting them to LTV. The SEC also has the right to confer with the Special Officer. Although the Final Judgment provides that the SEC may be requested to keep confidential the Special Officer's reports, the discretion to request such treatment rests with the Special Officer and not LTV.[12]

In certain ways the Special Officer is more akin to a public official than privately retained counsel. But this is the start, not the end of the analysis. The Special Officer's function is a hybrid of two roles, those of government investigator and privately retained counsel. Each of the Special Officer's conceptual parents, when serving his "client" alone, works within a certain sphere of confidentiality. More accurately, the "clients" of lawyers serving in each of these two roles enjoy some privilege against compelled disclosure at the behest of third parties. But, because the Special Officer does not fit neatly within the limits of either conventional role, the privilege which the Special Officer may assert is not contiguous with that afforded either "client" alone. Rather, the sphere of confidentiality which the Special Officer might expect to enjoy is a synthesis of the privileges available to his "clients" were he serving in the roles of government investigator or private investigatory counsel. We will examine the protection from discovery that the parents of the Special Officer could expect under more conventional circumstances to determine what protection the offspring shall be afforded. We will then turn to how the privilege here sought represents a departure from the past.

### 2. The Privilege which Private Investigatory Counsel or a Government Investigator Could Assert.

Had LTV retained Wozencraft not in compliance with the Final Judgment but in anticipation of an SEC enforcement proceeding, it is evident that the combination of attorney-client privilege and the work-product rules would afford privileged status to most, if not all, of what the class seeks from Wozencraft. *See* pages 599–613, *supra; Upjohn Co. v. United States, supra; Diversified Indus., Inc. v. Meredith, supra* ; Fed.R.Civ.P. 26(b)(3).

Wozencraft's investigative assignment has two overlapping emphases: to investigate questionable accounting and auditing practices to determine how they can be brought into compliance with SEC standards, and to investigate the conduct of corporations and to advise whether legal action should be taken for any material misconduct found. This investigation with its two emphases, particularly when made in the face of a pending enforcement proceeding, is the type of activity protected by the attorney-client privilege and work-product rule.

As earlier noted, the three elements required to establish the attorney-client privilege are: counsel must be acting as an attorney, the communication must be between attorney and client, and the communication must have been made and maintained in confidence under circumstances where it is reasonable to assume that disclosure to third parties was not intended. All three elements presumably would be present here had Wozencraft been retained by LTV as ordinary counsel.[13]

Wozencraft's investigation of the questionable accounting and auditing practices is not altogether dissimilar from the investi-

---

12. In paragraph (9.) of the retention agreement, LTV requires Wozencraft to seek such confidential treatment to the extent authorized by the Final Judgment.

13. Even had LTV retained Wozencraft with the intention of eventually releasing his report to the SEC, it is by no means clear that such

disclosure would do more than work a partial waiver of the attorney-client privilege. *See Diversified Indus., Inc. v. Meredith, supra,* at 611; *Byrnes v. IDS Realty Trust,* 85 F.R.D. 679, 685–89 (S.D.N.Y.1980); *In re Grand Jury Subpoena Dated July 13, 1979,* 478 F.Supp. 368, 371–73 (E.D.Wis.1979).

gation at issue in *Upjohn.* There, as the result of an independent audit, the corporation chose to have its counsel investigate "questionable payments" made by its employees. Sustaining the claim of privilege, the Court noted that the attorney-client privilege not only furthers the ability of counsel "to formulate sound advice when their client is faced with a specific legal problem" but also facilitates the "valuable efforts of corporate counsel to ensure their compliance with the law." Here, as in *Upjohn,* the corporation is faced with a "vast and complicated array of regulatory legislation ... compliance with [which] is hardly an instinctive matter." *Id.* It is difficult, if not impossible, to discern how LTV can bring its accounting and auditing practices into compliance with SEC standards without expert legal advice, and how such advice is to be rendered without the benefit of an investigation of the questionable practices.

Not all of Wozencraft's effort involves soliciting confidential communications. The effort will also generate data that falls outside an attorney-client privilege because it was not communicated to him in confidence or because other elements of an attorney-client privilege were absent. This gathered data nonetheless would enjoy the protection afforded work-product. Wozencraft's investigation, being conducted in anticipation of legal proceedings, also would be entitled to the protection available under Rule 26(b)(3). LTV's anticipation of litigation cannot be disputed. Considering that the SEC already had initiated its investigation, there can be little doubt that additional litigation was on its way. *Cf., Upjohn Co. v. United States, supra* (tax summons sufficient to trigger work product rule).

Our observation at this point is only that if the Special Officer were privately retained counsel, the information he is now gathering would be protected from all discovery unless supported by good cause. And good cause has not been shown here. The class' assertion of "undue hardship"—that they will need to engage in extensive and costly duplication of Wozencraft's investigation, and that the suggested discovery time schedule is insufficient for meaningful discovery without discovery of Wozencraft—are not the type of grounds upon which discovery of work product can be predicated. Potential duplication of effort and cost is implicit in every application of the work-product rule. Unless the cost of such duplication is prohibitive, such cost will not, of itself, serve as "undue hardship" within the meaning of Rule 26(b)(3). *See* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2024 (1970). Moreover, the class has submitted no evidence that would meet its burden of demonstrating prohibitive costs. *See Hickman v. Taylor, supra,* at 512, 67 S.Ct. at 394. As for the asserted time constraints, this court will supervise the discovery so as to ensure that the class members "are given a fair chance to pursue their cause of action." [14]

The investigation of potential employee misconduct in contemplation of litigation against those employees would also fall within the attorney-client privilege and work-product rule and requires no detailed analysis. Here, unlike in *Diversified Indus., Inc. v. Meredith, supra,* at 604, there is more than a "remote prospect" that the investigated conduct may "ultimately result in litigation of some sort in the future." [15]

---

**14.** The class has argued that the rule is waived by an intent eventually to disclose the work-product to a third party. The work-product rule, however, is directed specifically at maintaining secrecy from potential adversaries. *See GAF Corp. v. Eastman Kodak Co.,* 85 F.R.D. 46, 52 (S.D.N.Y.1979) ("[T]he purpose of the work-product protection ... is to prevent an opposing party from securing the protected information rather than to prevent the outside world generally from obtaining the informa-

tion.") *See also* 8 C. Wright & A. Miller, *supra,* § 2024.

**15.** That Wozencraft is to investigate employee misconduct for possible litigation against culpable personnel is not only obvious from the express terms of the Final Judgment, but from those provisions that require Wozencraft to advise investigated employees that they may be represented by counsel and may refuse to testify in the exercise of their constitutional and

We turn now to the other conceptual pole in this analysis, examining the privilege that could be asserted by an SEC investigator undertaking the same work as Wozencraft. SEC regulations prohibit the disclosure of information or documents obtained by employees of the Commission in the course of an investigation. 17 C.F.R. §§ 230.122, 240.0–4; *see* 15 U.S.C. 78x(b). The SEC has indicated that this investigation, if conducted by SEC employees, is the type of investigation ordinarily considered confidential under the Commission's regulations. The class, however, could attempt to "discover" documents generated in such an SEC investigation through a Freedom Of Information Act ("FOIA") request. *See* 5 U.S.C. § 552. But as noted by the SEC in its brief,[16] both the FOIA and the Commission's enabling regulations exempt such documents from FOIA disclosure.

Section 552(b) exempts from the disclosure provisions of the FOIA those "matters that are ... (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency; ... [and] (7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings...." The section also provides that "[a]ny reasonably segregable portion of a record shall be provided ... after deletion of the portions which are exempt...."

While it is now unclear whether the SEC must keep its intra-agency memorandums and investigatory records confidential, *see Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979),[17] the Commission's regulations authorize it to do so. *See* 17 C.F.R. §§ 200.80(b)(5), (7), 203.2,

230.122, 240.0–4. The SEC's motion to have Judge Taylor enjoin the class' discovery of Wozencraft is evidence that the Commission, at least for now, wishes to hold in confidence these particular memorandums and investigatory records.

Most of the work being done by Wozencraft would appear to fall within exemption 7(A)—investigatory records compiled for law enforcement proceedings whose disclosure would interfere with enforcement proceedings. While the SEC is not required to show how each individual record meets the exemption, but may base its assertion of interference on a generic evaluation of the type of proceeding involved and the type of records at issue, *see NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978), it must demonstrate that disclosure will prejudice an ongoing enforcement proceeding. *See OKC Corp. v. Williams*, 489 F.Supp. 576, 584 (N.D.Tex. 1980). This court is persuaded that if Wozencraft's work was that of an SEC investigator, the Commission would be able to meet its burden of showing interference with an enforcement proceeding. As noted by the Commission with respect to the class' attempted discovery, such disclosure will not only prematurely expose theories about past conduct and future avenues of investigation, but would prejudice the Special Officer's [SEC's] ability to obtain spontaneous and complete testimony. *See* pages 618–619, *infra*.

It is possible, however, that the class could discover the work of an SEC investigator under Fed.R.Civ.P. 26 even though it could not do so by a request under the FOIA.[18] Ordinarily, where the government is not a party, its investigatory records are not discoverable if disclosure would

other privileges. *See* paragraphs IX(B) and XI of the Final Judgment.

**16.** The SEC has moved Judge Taylor to enjoin any discovery of the Special Officer. A copy of the motion and supporting brief has been submitted to this court by the Commission.

**17.** We do not decide whether 15 U.S.C. 78x(b) would allow a "reverse" FOIA suit. *See* Block

& Barton, "Internal Corporate Investigations: Maintaining the Confidentiality of a Corporate Client's Communication With Investigative Counsel," 35 *Bus.Law.* 5, 29 (1979).

**18.** To the extent an intra-agency memorandum is ordinarily discoverable under the Federal Rules of Civil Procedure, it may be obtained under the FOIA.

prejudice an ongoing investigation. *See 4 Moore's Federal Practice* ¶ 26.61[5.–1] (1979); *cf., Cooper v. Department of Navy,* 558 F.2d 274 (5th Cir. 1977). But under certain limited circumstances, the legitimate needs of a private litigant outweigh the government's need to maintain confidentiality. *See, e. g., Pilar v. SS Hess Petrol,* 55 F.R.D. 159 (D.Md.1972). The class has not shown hardship that overcomes the Executive branch's privilege to protect the integrity of its law enforcement investigations. The class, at best, has alleged that it will be expensive and time consuming to duplicate the Special Officer's work; there is no suggestion that they are unable to do so. Where private litigants have access to the original sources of information, it is an exceptional circumstance that the government should be forced to prejudice an ongoing investigation by disclosing its investigatory records. *See Russ v. Ratliff,* 68 F.R.D. 691 (E.D.Ark.1975).

The documents generated by Wozencraft's ongoing investigation thus could not be obtained by the class under either the FOIA [19] or Fed.R.Civ.P. 26 were Wozencraft an SEC employee investigating LTV pursuant to the Commission's statutory authority.

### 3. *Recognition of a Special Officer's Privilege.*

 It thus is apparent that the class would be unable to obtain their requested discovery of Wozencraft were he either conventional investigative counsel or an SEC investigator. But the Special Officer's role is interstitial; he is too "public" to fall within the attorney-client privilege and yet insufficiently "public" to fall within the

Commission's disclosure restrictions. As noted, any privilege this court recognizes is necessarily a hybrid privilege, with its dimensions drawn by Wozencraft's role in the remedial scheme of the Final Judgment and the legitimate needs of the parties.

Special investigative counsel are an increasingly common element of SEC consent decrees. As argued by the Commission in its brief "[t]he appointment ... of Special Officers or Special Counsel to investigate the acts and practices of publicly-held corporations which have given rise to injunctive actions by the Commission has become an important tool in the enforcement of the federal securities laws." The use of such Special Officers has advantages for both the corporation and the SEC: it "benefits the corporation by minimizing federal interference into its corporate affairs, and benefits the SEC by allowing it to employ its limited investigative resources elsewhere." *Handler v. SEC,* 610 F.2d 656, 659 (9th Cir. 1979).[20] In resolving this discovery dispute, this court must take cognizance of how the requested discovery may affect this developing procedure of negotiated corporate self-investigation. *Cf., Diversified Indus., Inc. v. Meredith, supra* at 611.

The class' discovery of Wozencraft's work would have immediate adverse impact on the ongoing investigation of LTV. Extensive deposition testimony and duplication of requested documents would necessitate days, if not weeks, of preparation. The efforts of Wozencraft and his staff during this period would not be devoted to fulfilling the mandate of the Final Judgment, but would be directed at providing private litigants with a more expeditious and economi-

---

**19.** Obviously, any segregable portion of the investigatory record whose disclosure is not prejudicial to the enforcement proceeding would have to be disclosed. *See* page 617, *supra.* It bears repeating that the class has access to corporate documents and records. A substantial part of what is at issue here is the class request for the records as collated by the Special Officer, or his analysis or compilation.

**20.** The SEC's use of ancillary injunctive relief not only allows the Commission to use its limited resources as effectively as possible, but it

permits the SEC to fashion meaningful consent decrees. *See* Hazen, "Administrative Enforcement: An Evaluation of the Securities and Exchange Commission's Use of Injunctions and Other Enforcement Methods," 31 *Hastings L. J.* 427, 442–44, 446–51 (1979) ("The effectiveness of the injunction consent decree as an enforcement device is increased to the extent that the Commission is willing to insist upon the type of ancillary relief that would increase investor protection.")

cal route to information otherwise available.

Recognizing this problem, the class has suggested that this court "closely" supervise the discovery of the Special Officer to reduce interference with his investigation. But the reality is that even "limited discovery," if indeed there is such a thing as "limited discovery", necessarily will impede the Special Officer.

The argument that the class will minimize their interference leaves a more serious consideration. Assuming that this court can protect the Special Officer's resources by confining discovery, this court can do little to eliminate the resulting chilling effect. As noted by the Commission:

> [T]he discovery of the Special Officer's work product by the plaintiffs in the private action may prematurely expose theories about past conduct on the part of individuals as well as avenues of investigation which are proposed for future witnesses. As in the case of an investigation by the Commission's staff pursuant to statute, such premature exposure could easily prejudice the Special Officer's ability to obtain spontaneous and complete testimony and thereby undermine the efficacy of the entire inquiry.

But perhaps the most serious consideration is the long-term effect of permitting this type of discovery. Undoubtedly, the SEC will seek to negotiate other consent decrees similar to that here. We cannot empirically assess the role of privilege in the use of special officers by administrative agencies. Our assessment is thus intuitive and indeed visceral. With that caveat, the court is "persuaded" that it is likely that corporations will be less willing to engage in this sort of self-investigation if the results of such an investigation can be discovered in parallel civil litigation. *Cf., Diversified Indus., Inc. v. Meredith, supra,* at 611. If such discovery is permitted, a corporation concerned about its exposure to civil liability would be more willing to risk SEC investigation, particularly in light of the exemption from public disclosure generally afforded the Commission's investigatory records.

*See* pages 616–618, *supra.* Allowing the type of discovery requested here may kill the goose that lays the golden egg—the Commission may be deprived of a useful enforcement option, while shareholders will hardly be benefited by inhibiting corporate self-investigation. That this species of "private ordering" or more accurately, "shared ordering", brings to the SEC's investigative-regulatory role a dimension of potentially great public benefit cannot be denied. The SEC simply cannot staff individual cases with lawyers of Wozencraft's experience, skill and support facilities; at least not without great risk of misallocation of its resources. We ought at least acknowledge that the choice before us may be between assembling a beefed-up administrative super-force capable of staffing investigations of any size and the practice of regulatory triage. This is not to suggest that we sit as a supportive arm of the SEC. It is to say that we must construe claims of privilege in their true factual context to ensure that the underlying policy justifications are served.

The class responds with three arguments why Wozencraft should not be protected from their discovery: that his retention was involuntary, that his services are investigative rather than legal in nature, and that any privilege has been waived by disclosure to the SEC.

Citing *Osterneck v. E. T. Barwick Indus., Inc.,* the class emphasizes that Wozencraft was not voluntarily retained by LTV. While the issue of voluntariness may be relevant to whether Wozencraft may assert the attorney-client privilege in its usual dimensions, it is an incomplete answer under the circumstances presented here. Moreover, it is by no means clear that LTV retained Wozencraft under duress. LTV voluntarily chose to enter into the consent decree and retain the Special Officer. Had it believed such an arrangement not to be in its best interest, it could have refused any negotiated agreement and risked an SEC investigation. In that event, LTV would have by necessity retained counsel to do much the same things now being done;

not out of a sudden fit of conscience or determination to punish the guilty but because it had to do so to both defend itself and stop incurring liability. In this sense, the unilateral retention of defense counsel is hardly ever "voluntary". Of course, the critical difference is that the SEC shares in the fruits of Wozencraft's efforts without any expense; the quid pro quo for which is the consent decree. As observed by the Ninth Circuit in *Handler v. SEC, supra,* at 659, the retention of special investigative counsel under such circumstances is "self-initiated." It follows that what is at issue here is whether an otherwise available privilege is lost by this sharing of benefits.

The class understandably singles out each of the conventional prerequisites for privilege missing here to deny protection to Wozencraft's work. Relying primarily on *Osterneck v. E. T. Barwick Indus., Inc., supra,* the class contends that Wozencraft's should not be privileged because he is employed by defendants for his investigative skills rather than his legal expertise. *See id.* at 85–86. In *Osterneck,* the issue before the court was whether special investigative counsel could assert the attorney-client or work-product privilege. Unlike here, the investigation had been completed, and the court had the benefit of the final report of a Special Review Committee. Upon reviewing the report, the court found that there was only one paragraph out of 220 pages that could be characterized as constituting legal advice, and that "advice" was little more than an innocuous restatement of the legal questions facing the corporation.

The mandate of Wozencraft and the Audit Committee is considerably broader than the scope of the investigation in *Osterneck.* Wozencraft is to investigate the acts and events leading to the SEC Complaint, specified auditing and accounting practices, and conduct of the involved corporate personnel. He also is to include in his report certain matters that may become apparent but

have not been corrected by defendants. Although there is some ambiguity as to whether the Special Officer is to recommend future courses of action (compare paragraphs VII and X of the Final Judgment), Wozencraft's retention agreement [21] (approved by the SEC) and the overall tenor of the Final Judgment make it clear that such recommendations are anticipated. Significantly, one of those recommendations will be whether "any action [should] be taken as to any officer, director or employee found to have engaged in material misconduct."

It is unlikely that the Special Officer could make any useful recommendation whether any action should be brought against LTV and J&L personnel, or even determine what type of conduct should be investigated, if he were not expected to apply his legal expertise to the investigation. Unlike the investigative counsel in *Osterneck,* the Special Officer's services are not merely those of a trained investigator who fortuitously possesses a law degree. The Special Officer's legal acumen is an essential element of the remedial scheme of the Final Judgment.

The class' final argument is that Wozencraft can assert no privilege on behalf of LTV because any privilege is waived by disclosure to the SEC. Disclosure to the SEC, of course, is an essential element of the consent decree. Without such access, the Commission would be unable to determine the exact nature of LTV's violations and whether proper corrective measures are being taken. To argue that Wozencraft is deprived of protection because of disclosure to the SEC is to assume an answer to the question at issue here: Whether there are interests that warrant the application of some form of hybrid privilege. Moreover, even were the analysis solely in terms of the attorney-client privilege, the voluntary disclosure of information to an agency, as part of an agency enforcement proceeding, often is viewed as only a partial waiver of

---

21. Paragraph (1.) of the retention agreement provides that Wozencraft is "authorized to investigate certain matters ... so that [he] can

make recommendations to LTV's Audit Committee concerning possible future courses of action."

the attorney-client privilege. *See* note 13, *supra*. Nor is the sharing of data by joint participants inconsistent with assertions of privilege where the attorney-client and work-product privileges are concerned. The investigation is a joint enterprise of LTV and the SEC, not unlike the joint defense otherwise recognized by the cases. *See* pages 603–605, *supra*.

The class contends that unless the Special Officer fits squarely within the attorney-client privilege or the work-product rule, he cannot assert any privilege against their discovery. But such privileges ought not be as inflexibly applied as the class suggests. Changing circumstances require courts constantly to review the need for and extent of existing privileges. *See Trammel v. United States*, 445 U.S. 40, 47, 100 S.Ct. 906, 911, 63 L.Ed.2d 186 (1980). Similarly, as an evolving society engenders new relationships, courts must consider whether interests are created that require some form of protection.[22]

But the source of our warrant to recognize a privilege for the special officer is a legitimate question. Both the attorney-client and work-product privileges were judicially created concepts. Their history has shown them to be reasonably flexible. Their precise dimensions have been proved to be sufficiently malleable to fulfill their central purposes as the nature of the circumstances under which they were asserted have changed. The class' argument is ultimately premised upon a rigidity of concept these privileges were never saddled with. Despite decades of refinement, the outer limits of the privileges are still amorphous. *See, e. g., Upjohn Co. v. United States, supra*. The very nature of the subject precludes the type of wooden application of inflexible rules urged upon this court.

That such privileges cannot be reduced to simple doctrinal statements was recognized by Congress in its adoption of Rule 501 of the Federal Rules of Evidence. Congress rejected the detailed rules proffered by the Advisory Committee, and instead, directed the federal courts to apply "the principles of the common law as they may be interpreted ... in the light of reason and experience."[23] In *Trammel v. United States, supra* at 47, 100 S.Ct. at 911, the Court recently emphasized that Congress' purpose was to "'provide the courts with the flexibility to develop rules of privilege on a case-by-case basis,' 120 Cong.Rec. 40891 (1974) (statement of Rep. Hungate), and to leave the door open to change."

There is a judicial role that, in addition to that of expounder of federal common law, provides warrant for the privilege here created. The Northern District of Texas has continuing jurisdiction, indeed duty, to superintend implementation of the consent decree. At the core of the decree lies the corporate self-examination now under way. The need for protection from discovery that underlies all the court has discussed before may be met by this court's exercise of its equity power to ensure performance of its earlier decree.

Finally, the class has shown no need for discovery that justifies the adverse impact rejection of a special officer's privilege would have on this investigation and on the Commission's ability to negotiate similar consent decrees. In essence, the class seeks a "free ride." A "free ride," is not, of itself, a persuasive reason for incurring the costs of this discovery. *See* note 5, *supra*.

### 4. Conclusion.

For the stated reasons, this court finds that LTV and the SEC are entitled to assert a privilege in response to the requested discovery from the Special Officer. Unless

---

**22.** For example, other courts dealing with the confidentiality of certain forms of corporate internal analyses have developed a "self-evaluation" privilege. *See, e. g., O'Connor v. Chrysler*, 86 F.R.D. 211 (D.Mass.1980); *McClain v. Mack Trucks, Inc.*, 85 F.R.D. 53 (E.D.Pa.1979).

**23.** The language of Rule 501 is modeled after former Rule 26 of the Federal Rules of Criminal Procedure. The original Committee Note to Rule 26 observed that the rule "does not fetter the applicable law of evidence to that originally existing at common law ... [but] that the law may be modified and adjusted from time to time by judicial decisions."

the class can demonstrate a compelling need for individual items, all documents, interview transcripts, notes, and reports generated by the Special Officer, or prepared by defendants *solely* for the use of the Special Officer, need not be produced. Nor may Wozencraft or any member of his staff be required to testify regarding the content of such items or any conclusions they may have drawn from them.

The privilege here recognized is neither an attorney-client nor work-product privilege, although it draws from both. It recognizes that in publicly held companies an attorney-client privilege may not be absolute, as held in *Wolfinbarger*, and sets a standard of protection akin to that of work-product under Rule 26(b).

The conclusion to be drawn from a review of the privilege here accorded the Special Officer as measured by the privileges of attorneys fulfilling more conventional roles is that we protect from compelled disclosure little, if any at all, that would otherwise be disclosed. And while not disserving the principle of entitlement to every man's evidence we serve the overriding policy underlying the privileges themselves; use of attorneys to further private dispute resolution and provide normative guidance.